UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                          Case No. 8:24-cr-330-VMC-CPT

JORDAN GUY MACDONALD GOUDREAU,
YACSY ALEXANDRA ALVAREZ MIRABAL.
_____/

JOINT DEFENSE MOTION
TO
COMPEL PRODUCTION OF *BRADY* MATERIAL

Defendants JORDAN GUY MACDONALD GOUDREAU and YACSY ALEXANDRA ALVAREZ MIRABAL, through undersigned counsel, jointly request that this Honorable Court compel the production of the items identified herein, since efforts to obtain these items by request and through negotiation have been so far unsuccessful. In support thereof, defendants state as follows:

*Background*

1. This case was indicted on July 16, 2024, on charges of Conspiracy to Export Arms in Violation of Export Control Regulations. Doc. 1.

2. Defendants have provided notice that whatever actions they may have taken in connection with the allegations in the indictment were undertaken with

the sincere belief that they were sanctioned by the highest levels of the Executive Branch. *See* Defense Notice of Public Authority Defense (pending); *see also United States v Alvarado*, 808 F.3d 474 (11th Cir. 2015); jury instruction approved in *United States v. Anderson*, 872 F.2d 1508, 1517–18 n.14 (11th Cir. 1989).

3. Jordan Goudreau was recruited by a known long-time associate of the President of the United States, to work with Juan Guaidó, then-recognized by the United States as the Acting President of Venezuela, to arrange the May 2020 incursion of Venezuela. In late 2019, Mr. Goudreau signed an agreement with President Guaidó' in Miami, Florida, and for that and other reasons, believed that his activity had the approval of the top levels of United States Government.

4. Mr. Goudreau is a decorated combat veteran who served from 2001 until 2016, and in that time was involved in several classified missions in foreign countries in service of the Joint Special Operations Command (JSOC), and not dissimilar to the May 2020 incursion in Venezuela. Ms. Alvarez, a Venezuelan national, formerly served as the executive assistant to the chief executive officer of the largest oil company in Venezuela, holds a master's degree, in part earned through study at Georgetown University in Washington, D.C.

5.     On February 4, 2020, only a few months after signing the contract with President Guaidó (and a few months prior to the May incursion), Mr. Goudreau and Ms. Alvarez watched Guaidó introduced as the "true and legitimate President of Venezuela" recognized by "59 nations" to a standing ovation of a joint session of Congress by President Donald J. Trump at the State of the Union address. *See* two and one-half minute excerpt shown on the Public Broadcasting Service News Hour, available at: **https://www.youtube.com/watch?v=tOibfOxrbd4**.

6.     While the government has provided voluminous discovery, and some *Brady* items required, negotiations have failed to produce agreement concerning certain categories of information the defense believes are necessary to defend this case. So, for example, records of—or summaries of—sensitive missions in which Mr. Goudreau participated on behalf of SOCOM in foreign venues the defense submits are relevant to establishing his sincere belief that *this* alleged undertaking in Venezuela were legitimate and lawful.

7.     Additionally, members of Congress present for the February 2020 State of the Union address, conducted an inquiry after the widely publicized May 2020 incursion, based on *their* belief that this incursion must have had United States' sponsorship.

8. Carrie Filipetti, at the time the United States State Department Deputy Assistant Secretary over Cuba and Venezuela, told FBI agents in May 2021, (FBI FD-302) DISC-101026–29, that she "gave multiple briefings to [C]ongress" about the May 2020 incursion because "[t]he [S]enate was concerned that GOUDREAU'S operation was a US sanctioned activity and Nicolas Maduro was probing the US about their involvement and sanctioning of GOUDREAU's actions." Ms. Filipetti also told agents that "in March of 2020 [two months prior to the incursion] Diosdado CABELLO, the former president of the National Assembly of Venezuela, held a press conference that mentioned GOUDREAU and his operation in Colombia [training Venezuelan ex-pats for military action]."

9. Since the country was in the middle of an extremely contentious presidential election when these briefings were conducted, there were many heightened political sensitivities obviously present. It is worth pointing out, however, that the obvious goal of the questions of Senators and House Members was to establish precisely our defense—that whatever actions were taken in May 2020 in Venezuela had the backing of the Trump Administration at the highest levels. Presumably, almost all of those asking these questions were part of the standing ovation for President Juan Guaidó' a few months prior, when President

Trump offered the full support of the United States for the Venezuelan's efforts to free his country from the tyranny of Nicolas Maduro.

10.   It is also worth noting that, while the Government has consistently taken the position that defense counsel have no need for security clearances to review information in this case, several answers to questions of the Senate Foreign Relations Committee contain the phrase "the Department recommends a classified briefing."  *See* Exhibit A, answers to Questions 44–48.

11.   In response to a defense request for all details of these briefings of Congress by the State Department, the government has produced two undated, unsigned documents, filed as Exhibits A and B with this motion.

12.   "Exhibit A" is 15 pages and captioned, "Senate Foreign Relations Committee Questions on Operation Gideon."  There is no date, no author indicated, no information on which Senator or committee staffer propounded the question.  It contains 63 questions and answers, with again, no authors identified.

13.   "Exhibit B" is five pages and entitled, "Additional Justin Goudreau Questions from Hill."  It is also undated, without identified authors of questions or answers, and is numbered "5 through 14."  The questions and answers are very obviously relevant to the charges filed in this case.

## Memorandum of Law

The defendants are entitled to these materials under *Brady* and *Giglio*, and progeny. The Government is obligated to disclose any favorable evidence to the accused where the evidence is material to guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). Favorable evidence includes both evidence that is directly exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676-77 (1985). The "materiality" of such evidence to guilt or punishment, however, is "an inevitably imprecise standard." *United States v. Agurs*, 427 U.S. 97, 108 (1976).

Although the same "imprecise standard" applies in the pretrial and post-trial context, the Supreme Court has recognized a "practical difference" between the pretrial decision of the prosecutor, who must decide what, if anything, to produce to the defense, and the post-trial decision of the judge, who must decide whether a nondisclosure violated due process. *Id*. Consequently, "and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Id*.; *see also Cone v. Bell*, 129 S. Ct. 1769, 1783 n.15 (2009) ("As we have often observed,

the prudent prosecutor will err on the side of transparency, resolving doubtful questions in favor of disclosure."); *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) (stating that "a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence").

Because of the challenges facing a prosecutor attempting to determine, pretrial without full knowledge of all defense theories, whether a particular piece of information is material to the defense, the Department of Justice has for nearly a decade required "disclosure of 'information beyond that which is 'material' to guilt as articulated in *Kyles v. Whitley*, 514 U.S. 419 (1995),' and encourages AUSAs to 'err on the side of disclosure.'" Federal courts have also recognized this sound policy. *E.g., United States v. Safavian*, 233 F.R.D. 12, 14 (D.D.C. 2005). Judge Friedman in *Safavian* explained why all "potentially exculpatory or otherwise favorable evidence" should be produced without regard for whether prosecutors believe the evidence is material:

> Most prosecutors are neither neutral (nor should they be) nor prescient, and any such judgment necessarily is speculative on so many matters that simply are unknown and unknowable before trial begins: which government witnesses will be available for trial, how they will testify and be evaluated by the jury, which objections to testimony and evidence the trial judge will sustain and which he will overrule, what the nature of the defense will be, what witnesses and

> evidence will support that defense, what instructions the Court will ultimately give, what questions the jury may pose during deliberations (and how they may be answered), and whether the jury finds guilt on all counts or only on some (and which ones). The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial.

*Safavian*, 233 F.R.D. at 13-14.

This case, as envisioned by the Government, may appear straightforward—there were no export licenses issued, items requiring licenses and originating with defendants were recovered in a foreign country. Case closed. The *Government* appears to take the position that any other surrounding facts and circumstances are unimportant and immaterial. However, the defendants, in establishing an affirmative defense including a *sincere belief* that their actions were approved by the top levels of the United States Government, needs the information the defense is requesting. In a case of this nature, it will be much too late for "rolling" disclosures at the time of trial. To ensure an adequate defense at trial, this needs to be sorted out now.

**"It should be obvious to anyone involved with criminal trials that exculpatory information may come too late if it is only given at trial . . .." *United States v. Campagnuolo*, 592 F.2d 852, 859 (5th Cir. 1979).**

The withholding of *Brady* material pretrial gives the Government a big advantage by foreclosing its use during defense openings. Opening statements

have been long acknowledged to be extremely important in persuading jurors. "Many experienced trial lawyers contend, and the empirical jury studies tend to confirm, that an opening statement is frequently the most critical stage in the trial of a lawsuit, as here the jury forms its first and often lasting impression of the case." 75 Am. Jur. 2d *Trial* § 429 (1964). A 2001 Cornell University study found that 85% of mock jurors exhibited "predecisional distortion," meaning their interpretations of incoming evidence were biased toward the party they favored early in the case. The more confidence the juror had in the early judgment made, the more biased they were in viewing evidence submitted. Kurt A. Carlson and J. Edward Russo, *Biased Interpretation of Evidence by Mock Jurors*, J. Exp. Psychol.-Appl., Vol. 7, No. 2, 91–103 (2001).

     A commonly used tactic is the withholding of *Brady* material for tactical advantage, while including it with Jencks turned over at the last possible moment. This provides maximum advantage while protecting the case on appeal—the argument is then made that the defense *had* the material so no *real* harm was done. Not to mention the fact that Jencks statements are only due to be produced *if* (and after) the Government calls the witness, otherwise the information remains buried in the archives likely never to see the light of day. *See* 18 U.S.C. § 3500.

This is a disingenuous tactic and obfuscates the real harm to fairness done by late disclosures of material helpful to the defense.

**This Court's intervention is required, and it is in the best position, by far, to fashion a pre-trial remedy that will ensure a fair trial. "It is within the sound discretion of the district judge to make any discovery order that is not barred by higher authority."** *Campagnuolo*, **592 F.2d at 857 n.2.**

In *Campagnuolo,* the Government unsuccessfully appealed a district court's extraordinary suppression of a defendant's statement solely based on the Government's discovery violation. *Id.* at 857–58. The appellate court rejected the Government's argument that the district court abused its authority with this discovery sanction because the Government's noncompliance had not prejudiced the defense. "This argument misconceives the district judge's broad discretion to administer sanctions for the violation of a valid discovery order." *Id.* (citing *United States v. Bockius*, 564 F.2d 1193, 1196 (5th Cir. 1977) and *United States v. Valdes*, 545 F.2d 957, 961 (5th Cir. 1977). "We find no abuse of discretion where, as here, a district judge for prophylactic purposes suppresses evidence that, under a valid discovery order, the government should have disclosed earlier, even if the nondisclosure did not prejudice the defendants." *Id*. As a remedy for a failure to comply with a discovery order, a district court may

> permit . . . inspection . . . or it may enter such other order as it deems just under the circumstances." Fed.R.Crim.P. 16(d)(2). A district court's decision [as to appropriate sanction or remedy] is a matter

10

committed to the court's sound discretion. Absent an abuse of discretion, the court's decision will not be disturbed on appeal.

*United States v. Fernandez*, 780 F.2d 1573, 1576 (11th Cir. 1986) (internal citations omitted).

A trial court fashioning a remedy is not limited to simply restating the Government's existing discovery obligations. The Court has the inherent power to craft prophylactic relief, beyond the ordinary scope of those obligations, to secure a defendant's right to a fair trial. *See, e.g.*, Fed.R.Crim.P. 16(d)(2) (permitting a trial court to enter any remedial order "that is just under the circumstances."); *United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991) ("The trial court holds great latitude in the management of the discovery process, including fashioning the appropriate remedy for alleged discovery errors."); *United States v. Carrigan*, 804 F.2d 599, 602–05 (10th Cir. 1986) (finding that although the Federal Rules did not empower a district judge to grant the defendant depositions of government witnesses under the circumstances of the case, the court had the inherent power to do so); *United States v. Jackson*, 508 F.2d 1001, 1005–08 (7th Cir. 1975) (holding that the district court had the inherent power to order the government to produce a witness list, although no statute or rule provided for this); *United States v. Williams*, 792 F.Supp. 1120, 1123 (S.D. Ind. 1992) ("[A] court has certain inherent authority to order and

supervise discovery in a criminal case above and beyond any of the mentioned rules."); *United States v. George*, 786 F.Supp. 11, 15 (D.D.C. 1991) ("Because an item does not fall within Rule 16 does not mean, however that they [*sic*] cannot be made available to defense counsel. A district court judge may be permitted to order discovery beyond that specified by Rule 16.").

It is here worth noting that the Government's failure to comply with *Brady* or standing discovery orders was not a new problem when this Circuit decided *Campagnuolo* some forty-six years ago. "The Court is continuously presented with situations wherein the Government has not complied with the dictates of [the Standing Discovery Order in use since 1973] and is increasingly frustrated by the effect this non-compliance has upon the administration of justice in [the Southern District of Florida]. *Campagnuolo*, 592 F.2d at 864 (quoting the district court's order).

Only this Court is likely to be able to guarantee real fairness in this trial; correction of any *Brady* errors post-trial will be limited to clearly willful *Brady* violations. While the Government may object that the disclosures requested here exceed what is required, it cannot demonstrate that the requested order would prejudice its case. At *most*, it would suffer a slightly diminished tactical advantage, which it would have kept had it taken seriously its constitutional

obligations and the Order of this Court. Conversely, the defense *will* almost without question suffer prejudice if discoverable information is only extracted through cross-examination, disclosed late as Jencks, or uncovered in some other way late in the trial. Late disclosures of *Brady* prevent defense investigation to develop or use the information, its use during opening statements, planning for cross-examinations and its use in planning defense strategy. Belated disclosure of information helpful to the defense usually prevents it from being used most effectively, which is of course the point of withholding it.

## Conclusion

"*Brady* protects an accused's due process right to a fair trial." *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996) (amended on other grounds). "[R]equiring the Government to disclose evidence is to promote 'the fair and efficient administration of criminal justice . . . and by otherwise contributing to an accurate determination of the issue of guilt or innocence.' Fed.R.Crim.P. 16 advisory committee note." *United States v. Euceda-Hernandez*, 768 F.2d 1307, 1312 (11th Cir. 1985). As this Circuit has repeatedly affirmed, "'*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.'" *Campagnuolo*, 592 F.2d at 859 (citing *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978) and *United States v. Agurs*, 427 U.S. 97, 107 (1976)).

This Court has, by far, the most important role in ensuring that due process is afforded to the accused, because the appellate process is not suitable of correcting any but the most egregious trial errors.  So, accused persons who have a constitutional right to effectively make use of *Brady* have only this Court's discretionary intervention as a means of ensuring that the Government complies with its discovery obligations.  And as set forth above, this Court has more than sufficient authority under the law to fashion whatever remedy it deems reasonable.

## Specific Requests

**WHEREFORE,** the defendants respectfully request that the Court issue an Order requiring the Government to provide the following items:

1. All government records concerning Jordan Goudreau's participation in operations conducted by the United States Armed Forces Joint Special Operations Command (JSOC) since January 2006.

2. Any documentation or records concerning personal meetings Keith Schiller has had with either President Donald J. Trump or members of President Trump's immediate staff during the relevant time leading up to the [Gideon] and in its aftermath, to the present date.

3. Any and all documents related to State Department briefings of members of Congress concerning "Operation Gideon" and/or the incursion into Venezuela in May 2020, the subject event alleged in the present indictment, including copies of notes and briefing materials, any audio or video recordings, identities of briefers, members of the House or Senate who may have been present, as well as staff members, as well as any correspondence between the State Department and Congress about these briefings, or reports concerning same.

4. Any and all correspondence between or among any United States government agencies about these briefings and/or the May 2020 events in Venezuela.

5. Any records of any communications concerning Jordan Goudreau or Keith Schiller or concerning President Donald J. Trump's or Vice President Mike Pence's knowledge of the May 2020 incursion, between Juan Guaidó, Interim President of Venezuela or his representatives, and any United States Government personnel, before, during or after the incursion.

6. All text messages exchanged between James Beardsley and Jordan Goudreau. The messages produced to date are incomplete.

7. Logs of meetings held in the SCIF in Virginia including Vice President Mike Pence with Keith Schiller and/or Roen Kraft from February 2019 through January 2021.

Respectfully submitted,
*S/Christophir A. Kerr*
Christophir A. Kerr, P.A.
Florida Bar No. 72041
13801 Walsingham Rd., #A-154
Largo, FL 33774
(727) 492-2551 - telephone
E-mail: christophirkerr@gmail.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing has been furnished by electronic filing to Elizabeth M. Warren, Clerk of the Court, U.S. District Court, Middle District of Florida, U.S. Courthouse, 801 N. Florida Ave., #223, Tampa, FL 33602-3800, on this 9th day of January 2025, for distribution to parties of record.

*S/Christophir A. Kerr*
Christophir A. Kerr