**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                   **Case No. 8:24-cr-330-VMC-CPT**

**YACSY ALEXANDRA ALVAREZ MIRABAL.**
_____/

<u>**RESPONSE TO UNITED STATES' MOTION IN LIMINE**</u>

# <u>DEFENSE EXHIBIT ONE</u>

Executed Agreements Between
Juan Guaidó and Silvercorp/Goudreau
for
Operation Gideon

## GENERAL SERVICES AGREEMENT
Entered Into This: 16th day of October 2019

This GENERAL SERVICES AGREEMENT (hereinafter "Agreement") is made this 16th day of October, 2019, by and between LA REPUBLICA BOLIVARIANA DE VENEZUELA (hereinafter "Administration") Juan Gerardo Guiado, acting President, and any successor administration(s) or duly elected Venezuelan government(s) and SILVERCORP USA, Inc. (EIN 30-1039889) of Melbourne, Florida (hereinafter "Service Provider").

I.    BACKGROUND & CIRCUMSTANCES of AGREEMENT:

The Administration, by the authority set forth in The Resolution of the National Assembly of Venezuela (23 January 2019) considering articles 233, 333, and 350 of the Bolivarian Republic Constitution, engages the Service Provider for the services set forth in this Agreement.  The Administration is of the opinion that the Service Provider has the necessary qualifications, experience and abilities to provide services to the Administration. The Service Provider is capable to provide and execute the services, and agreeable to provide services to the Administration on the terms and conditions set out in this Agreement. All Attachments in this agreement are reserved.

II.    SERVICES TO PROVIDE

The Administration hereby agrees to engage the Service Provider to provide the Administration with services (hereinafter "Services") consisting of, but not limited to: strategic planning/advising; project leadership; equipment procurement; hiring of personnel; logistics consultation; project execution advisement.

The Services will also include any other tasks that the parties may agree on during the term of the Agreement.  The Service Provider hereby agrees to provide those other tasks to the Administration during the term of this Agreement.  Such Services, and other tasks, shall be set forth in Attachments to be mutually agreed to by the parties and incorporated by the parties into this Agreement. The attachments are considered part of

General Services Agreement
Page 1 of 8

Scanned with CamScanner

the General Services Agreement and are legally bound to this agreement. The Parties agree to do everything necessary to ensure that the terms of this Agreement take effect.

## III.    TERM OF AGREEMENT & FEES

The term of this Agreement (the "Term") will begin on the date this Agreement is executed by the parties and will remain in full force and effect indefinitely until terminated as provided for in this Agreement. Service Provider and Administration agree the minimum duration of this agreement is 495 days. See Attachment A- Timing and Length of Agreement. Except as otherwise provided for in this Agreement, the obligations of the Administration and Service Provider will end upon the termination of this Agreement. Administration agrees to pay Service Provider the minimum amount of money required to fulfill this agreement  which is $212,900,000.00 USD over the course of the Term. The amount of money needed to fulfill the first part of Service Provider services is $50,000,000.00 USD. All money will be backed/secured with Venezuelan barrels of oil. All monies in this agreement are in USD. Administration agrees to pay any loan within 1 year. Service Provider will secure a loan for at least first part of services.

## IV.    CONFIDENTIALITY

The parties enter this Agreement and anticipate that disclosure of certain information by the Administration to the Service Provider will be central to the relationship.  The parties desire to maintain the confidentiality of such information.  This information (hereinafter referred to as "Confidential Information") may include, but is not limited to any data or information relating to the Administration which would reasonably be considered to be proprietary to the Administration including, government information and records where the release of that Confidential Information could reasonably be expected to cause harm to the Administration or citizens of Venezuela.

The Service Provider agrees that they will not disclose, divulge, reveal, report or use, for any purpose, any Confidential Information which the Service Provider has obtained, except as authorized by the Administration. This obligation will survive indefinitely upon termination of this Agreement.  All written and oral information and material disclosed or provided by the Administration to the Service Provider under this

General Services Agreement
Page 2 of 8

**Scanned with CamScanner**

Agreement is Confidential Information regardless of whether it was provided before or after the date of this Agreement or how it was provided to the Service Provider.  The Service Provider shall take all measures reasonably necessary to protect the Confidential Information received from the Administration, at least as great as the measures it takes to protect its own confidential information.  The Service Provider shall further assure that Confidential Information received from the Administration shall be separated from other Service Provider information in order to prevent commingling.

The Service Provider shall use the Confidential Information solely for the purpose of evaluating serviced for the Administration, and performing services for the Administration.  In no way shall the Service Provider use the Confidential Information to the detriment of the Administration.

Nothing in this Agreement is intended to grant or imply any rights, by license or otherwise, to the Service Provider under any copyright, trade or intellectual property right.  Nor shall this Agreement grant or imply to the Service Provider any rights in the Administration's Confidential Information.

The Service Provider agrees to indemnify the Administration against any and all losses, damages, claims, expenses, and attorneys' fees incurred or suffered by the Administration as result of a breach of confidentiality.

The Service Provider shall return to the Administration any and all records, notes, and other written, printed or other tangible materials in their possession pertaining to the Confidential Information immediately upon request by the Administration.  Upon termination of this Agreement, the Service Provider shall promptly:  a) deliver to the Administration all tangible documents and materials containing, reflecting, incorporating, or based upon confidential information; b) permanently erase all confidential information from its computer database(s); and, c) certify in writing to the Administration that it has complied with the requirements of this section.

The Service Provider understands and acknowledges that any disclosure or misappropriation of Confidential Information in violation of this Agreement may cause the Administration irreparable harm, the amount of which may be difficult to ascertain,

General Services Agreement
Page 3 of 8

Scanned with CamScanner

and therefore agrees that the Administration shall have the right to apply to a court of competent jurisdiction for specific performance and/or restraining order.

V.    RELATIONSHIP & REPRESENTATIONS OF THE PARTIES

In providing the Services under this Agreement it is expressly agreed that the Service Provider is acting as an independent contractor and not as an employee. The Service Provider and the Administration acknowledge that this Agreement does not create a partnership or joint venture between them, and is exclusively a contract for service. Attachment B  Rules of Service Provider Engagement.

VI.    NOTICE & DISPUTE RESOLUTION

All notices, requests, demands or other communications required or permitted by the terms of this Agreement will be given in writing and delivered to the Parties of this Agreement.

In the event a dispute arises out of or in connection with this Agreement, the Parties will attempt to resolve the dispute through good-faith consultation.  If the dispute is not resolved within a reasonable period then any or all outstanding issues may be submitted to mediation in accordance with any statutory rules of mediation. If mediation is unavailable, or is not successful in resolving the entire dispute, any outstanding issues will be submitted to final and binding arbitration in accordance with the laws of the State of Florida of the United States of America. The arbitrator's award will be final, and judgment may be entered upon it by any court having jurisdiction within the State of Florida.

VII.    MODIFICATION OF AGREEMENT

Any amendment or modification of this Agreement or additional obligation assumed by either party in connection with this Agreement will only be binding if evidenced in writing signed by each party or an authorized representative of each party.

IX.    TIME OF THE ESSENCE

General Services Agreement
Page 4 of 8

**Scanned with CamScanner**

Time is of the essence in this Agreement. No extension or variation of this Agreement will operate as a waiver of any provision, term or condition as set forth in this Agreement.

X.     ASSIGNMENT OF OBLIGATIONS

The Service Provider will not voluntarily or by operation of law assign or otherwise transfer its obligations under this Agreement without the prior written consent of the Administration.

XI.     CANCELLATION FOR CONVINIENCE

Administration may not at any time and for no reason terminate Service Provider's services and work at Administration's convenience. Service Provider may not at any time and for no reason terminate services and work at Service Provider's convenience. If Service Provider terminates agreement he forgoes all pay, compensation and expenses. Furthermore, Service Provider must pay back all money that was transferred with the exception of the initial retainer. If Administration terminates agreement, Administration will be responsible for all payments currently owed, all future payments defined in the Term of this agreement and three more months of payments on top of the agreed upon contract duration.

XII.     GOVERNING LAW

It is the intention of the Parties to this Agreement that this Agreement and the performance under this Agreement, and all suits and special proceedings under this Agreement, be construed in accordance with and governed, to the exclusion of the law of any other forum, by the laws of the State Florida of the United States of America, without regard to the jurisdiction in which any action or special proceeding may be instituted.

XIII.     MISCELLANEOUS

a) None of the provisions of this Agreement shall be deemed to have been waived by any act, omission, or acquiescence on the part of the Administration or the Service Provider without a written instrument signed by the parties.

General Services Agreement
Page 5 of 8

Scanned with CamScanner

b) Waiver by either Party of a breach, default, delay or omission of any of the provisions of this Agreement by the other Party will not be construed as a waiver of any subsequent breach of the same or other provisions.

c) The Headings in the Agreement are inserted for the convenience of the Parties only and are not to be considered when interpreting this Agreement.

d) This Agreement can be changed at any time by written mutual consent hereto by the parties.

e) This Agreement, along with any attachments, encompasses the entire Agreement, and supersedes any and all previously written or oral understandings and agreements between the parties, respecting the subject matter hereof.  The parties hereby acknowledge and represent, by affixing their hands and seals hereto, that said parties have not relied on any representation, assertion, guarantee, warranty, collateral contract or other assurance, except those set out in this Agreement, made by or on behalf of any other party or any other person or entity whatsoever, prior to the execution of this Agreement. The parties hereby waive all rights and remedies, at law or in equity, arising or which may arise as the result of a party's reliance on such representation, assertion, guarantee, warranty, collateral contract or other assurance, provided that nothing herein contained shall be construed as a restriction or limitation of said party's right to remedies associated with the gross negligence, willful misconduct or fraud of any person or party taking place prior to, or contemporaneously with, the execution of this Agreement.

f) The provisions of this agreement are severable. If any provisions of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable.

THEREFORE, in consideration of the matters described above and of the mutual benefits and obligations set forth in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, the Administration and the Services Provider

General Services Agreement
Page 6 of 8

**Scanned with CamScanner**

agree to this Agreement and attachments.   This Agreement has been signed on the 16th day of October, 2019, in two original copies in both the Spanish and English languages. The English version is superior in legal procedures.

By signing this General Service Agreement, Juan Gerardo Guaido, as president of the Bolivarian Republic of Venezuela, accepts, agrees and approves the terms and conditions described hereafter as well as the attachments of this General Service Agreement. The attachments will be signed by the designated Commissioners  Sergio Vergara and Juan José Rendón.

IN WITNESS WHEREOF the Parties duly affix their signatures under hand and seal on this 16th day of October, 2019.

SIGNED, SEALED, AND DELIVERED in the presence of or by video conference:

LA REPUBLICA BOLIVARIANA DE VENEZUELA (Administration)

SILVERCORP USA, Inc. (Service Provider)

By: _____

Juan Gerardo Guaido
President of Venezuela

By: _____

Jordan Goudreau,
CEO Silvercorp USA

By: _____

Sergio Vergara, Comisionado
High Presidential Commissioner for Crisis Management

By: _____

Juan Jose Rendon, Comisionado
High Presidential Commissioner General
Strategy and Crisis Management

Manuel J. Retureta
Witness

General Services Agreement
Page 7 of 8

Scanned with CamScanner

8 of 8

## ATTACHMENT N
## CHAIN OF COMMAND

The chain of command for this operation is as follows:

1. Commander in Chief - President Juan Guaido

2. Overall Project Supervisor - Sergio Vergara

3. Chief Strategist - Juan Jose Rendon

4. On Site Commander- To be determined

## ATTACHMENT O
## DENIABILITY/CREDIT

1. If for any reason the Project Resolution Operation does not succeed, President Guaido will maintain deniability and be absolved from all knowledge and fault by all parties.

2. If the Project Completion Operation (The exit/removal of current Venezuelan Regime and entrance/installation of recognized Venezuelan Government), All credit will be given to all parties as directed by the Administration.

*Page 39 of 41*



## ATTACHMENT P
## PROJECT RESOLUTION OPERATION APPROVAL

1.The final approval of the operation call be given by The Strategic Committee.

2.The Strategic Committee shall approve all stages of the operation to include, Pre deployment, Deployment, Infiltration, Vehicle Drop Off, Exfiltration, Medical Planning, Actions on the Objective, Contingencies and Command and Signal and Service and Support.

3.Emergency approval shall be given by the On Site Commander.



*Page 40 of 41*





# ATTACHMENT A
## TIMING AND LENGTH OF AGREEMENT

This attachment to the GENERAL SERVICES AGREEMENT set forth the following time frames:

1. Administration will pay non-refundable retainer to Service Provider in the amount of $1,500,000.00 (USD). This retainer shall include but is not limited to the Service Provider's initial assessment, administrative fees, legal fees, and interviews by Service Provider of related personnel. This retainer will be paid within 5 days of services agreement signing. The retainer payment shall be made via wire transfer in a manner and form as agreed by the parties. The retainer is non refundable.

2. *Initial Project Phase*

   a. 45-day force preparation, equipment procurement and mission readiness.

   b. The Initial Project Phase includes a time period of 30 days to forward deploy Service Provider advisors, equipment and begin to advise exiled Venezuelan military (hereinafter "Partner Group"). The combination of Service Provider personnel (hereinafter "Advisors") and Partner Group will hereinafter be referred to as "Task Group". An additional 15-day time period will be needed reach a minimum level of Task Group and project readiness. This Initial Project Phase (45 days) shall be at a cost of $50,000,000.00 (USD). This includes all operational costs, for both Partner Group and Service Provider personnel, and shall include but is not limited to vehicles, transportation, and fuel. The Administration shall bear no additional costs, and Service Provider does not anticipate further costs.

   c. If unforeseeable costs arise during the project, Service Provider will provide a purchase order to the Administration. Administration will approve, sign and check the purchase order. The final decision to purchase will be at the discretion of the Administration. 20% of the estimated Initial Project Phase cost will be at the discretion of the Administration. These funds will be for the purchase of

*Page 1 of 41*

communication, planning equipment and travel. The estimated total project cost will be 212,900,000.00 USD for 495 days.

3. *Continuing Force Readiness Phase*

   a. Service Provider shall improve project readiness through the Initial Project Phase and up to Project launch. Service Provider Advisors will advise Partner Group in project planning, medicine, communications, strategy and other subjects.

   b. Administration agrees to pay Service Provider each month after project completion (The exit/removal of current Venezuelan Regime and entrance/installation of recognized Venezuelan Government) a minimum of $10,860,000.00 (USD), an average of $14,820,000.00 (USD), and a maximum of $16,456,00.00 (USD). Any payment over $10,260,000.00 (USD) must be requested and given using purchase orders. This payment will include but is not limited to monthly Service Provider salaries, training expense/resupply, and operational funding. The client will not pay expenses. In the event that Primary Objective is removed or deemed obsolete, the Services Agreement will remain in place and the Task Group, per authorization and command of the Administration, will shift focus to advising in restoring stability in the country, presidential protection, counter-terrorism operations, and the recovery of stolen Venezuelan financial assets worldwide.

4. *Project Resolution Operation*

   a. Service Provider Advisors will advise and assist Partner Group in planning and executing an operation to capture/detain/remove Nicolas Maduro (heretoafter "Primary Objective"), remove the current Regime, and install the recognized Venezuelan President Juan Guaido. This operation hereinafter is referred to as "Project Resolution Operation". Project Resolution Operation is on order by Administration only. Project Resolution Operation is time sensitive. On order, the Task Group shall initiate Project Resolution Operation. In the event Nicolas Maduro relinquishes power as President, is removed by another group or government, or gives power to a different individual, before Project Resolution Operation takes place, Service Provider will continue services for duration of term.

5. Post Project Resolution Operation

    a. After project completion (The exit/removal of current Venezuelan Regime and entrance/installation of recognized Venezuelan Government), Service provider will continue advisor services in counter terrorism, counter narcotic operations and recovery of stolen Venezuelan financial assets worldwide for the duration of the agreement term.

6. Quick Reaction Force

    a. Service Provider Task Group will provide a Quick Reaction Group (QRG) in order to advise Venezuelan counterparts in conducting advisory operations in various locations. Their objectives will be identified by Administration.

7. *Compensation, Invoicing, and Payment*

    a. Service Provider shall secure a bridge loan from private investors to fund the project.

    b. Administration may choose to fund project without investment.

    c. Following the completion of this project, investors will have a preferred vender status with the new government in Venezuela.

    d. Service Provider does not require entire loan to begin services.

    e. The Administration agrees to begin paying back loan with interest to Service Provider within one month after project completion (The exit/removal of current Venezuelan Regime and entrance/installation of recognized Venezuelan Government)

    f. Once regime change is complete, the Administration has one year from project completion to pay back the remaining balance of the bridge loan.

        i. Administration allows Service Provider to negotiate best interest rate for loan.

g. Payments will be made from Administration to Service Provider with interest included. Service Provider will make payments to investors. Service Provider will charge the Administration a 10% office fee on all payments.

h. If the Administration pays the entire loan early, interest is not prorated and will be applied to entire loan amount. Administration is responsible for the loan amount given to Service Provider by an investor. Interest will be added to the entire amount. For example, if the amount of loan given to Service Provider by investor is 40 million USD and if the Administration pays back the loan in one year, and the interest rate is 55%, the interest will be 26 million USD. The Administration must pay 66 million USD to the Service Provider.

i. In the event of cash insolvency, Administration may choose to make payments in barrels of oil.

j. Payments will be in equal monthly payments. For example, If the entire loan is 100 million USD paid over 5 months. The Administration will make 5 equal payments of 20 million USD each month for 5 months.

k. Monthly payments shall be paid net 30 days following the Project Completion for each subsequent month until 450-days following Project Completion. "Project Completion" will be defined as the exit/removal of current Venezuelan Regime and entrance/installation of recognized Venezuelan Government.

l. If the investor stops loan any time after Project Completion Operation (The exit/removal of current Venezuelan Regime and entrance/ installation of recognized Venezuelan Government), the Administration will assume payments for Service Provider services.

m. Payment terms are net 30 days from the date the invoice is received. Unpaid invoices shall accrue interest at the rate of 1.5% per month.

n. The Administration shall pay a success bonus to Service Provider in the amount of $10,000,000.00 (USD). This bonus is contingent on a successful Project Completion Operation (The exit/removal of current

Venezuelan Regime and entrance/installation of recognized Venezuelan Government)

o. In the event of a dispute or question regarding any monthly payment to Service Provider: (a) all amounts not disputed or in question shall be promptly paid as and when required by this section; (b) Administration shall promptly transmit to Service Provider any explanation of the disuse or question; (c) Administration and Service Provider shall immediately seek to resolve in good faith the dispute or question; and (d) payment of any remaining amount shall be made within thirty (30) days of when the dispute or question is resolved. Service Provider may charge and accrue interest on any past due amounts (other than disputed amounts or amounts in question as described herin) at the lesser of 1.5% per month or the maximum rate permitted by law. During the term of the dispute, in no event shall the Service Provider stop or suspend work as long as Administration is paying undisputed payment amounts.

8. *Term*

a. The Effective Date of this Services Agreement will be date this agreement is signed. The Termination Date of this agreement will be 15 months (450 days) following project completion (The exit/removal of current Venezuelan Regime and entrance/installation of recognized Venezuelan Government).

b. The term of this agreement shall begin upon the Effective Date, and will continue until Termination Date, as provided herin.

c. Administration has the option to extend Service Provider services after Termination Date. Extension will be a minimum of 90 days. Administration must give verbal and written notice to Service Provider.

9. *Manner and Structure of Payments*

a. The Administration will pay the initial retainer fee of $1,500,000.00 (USD) within 5 days of signing the Engagement Letter.

b.  The Administration reserves the right to fund the entire project without investment.

c.  The investor is expected to invest $26,395,810 (USD) initially, and monthly payments of $10,860,000 (USD) to continue services by the Service Provider.

d.  The Administration obligations under this Agreement are superior to all other indebtedness of Administration.

10. *Subsequent Risk Management Services*

a.  All points in this section (9.b,9.c,9.d,9.e) are dependent on a successful Project Resolution Operation (The exit/removal of current Venezuelan Regime and entrance/installation of recognized Venezuelan Government. )

b.  Service Provider and Administration Agree to draw up and sign a Services Agreement for the creation of a National Asset Unit.

c.  Service Provider and Administration will agree upon price, term and services.

d.  Service Provider and Administration agrees to draw up a Services Agreement within 30 days of Project Completion (The exit/removal of current Venezuelan Regime and entrance/installation of recognized Venezuelan Government. )

e.  Creation of National Asset Unit

i.  Service Provider will change Task Group mission per instruction by the Administration. Task Group will convert to a National Asset Unit that will act under the direction the Administration to counter threats to government stability, terror threats, and work with GIC, FAES and DGCIM. Service Provider will provide services to this new National Asset Unit. These services include but are not limited to mission advisement, recruitment, selection and assessment, physical fitness programming, target programming, medicine, communications, demolitions, covert methods of entry, surveillance, close target reconnaissance.



*Page 6 of 41*

## ATTACHMENT B
### RULES OF SERVICE PROVIDER ENGAGEMENT

1. **GENERAL GUIDANCE:** This establishes the Rules of Engagement (ROE) for all Service Provider advisors and Venezuelan Partner Group under the control of Administration. The "Task Group" is the team of Service Provider advisors embedded with the Venezuelan Partner Group personnel.

   a. The Administration sets National Policy for the country of Venezuela and establishes engagement limits for the Task Group.

   b. Service Provider retain the inherent authority and obligation to offer the Administration all necessary means available to complete assigned tasks, and to take all appropriate action in self- defense of their personnel and Task Group personnel.

   c. Service Provider personnel are in an advisory capacity only. They are not combatants. They will not conduct unilateral operations. They will only conduct operations while colocated with Venezuelan Partner Group.

   d. At all times, the requirements of necessity and proportionality will form the basis of the judgment of the on-scene commander (OSC) or individual as to what constitutes an appropriate response in self-defense to a particular hostile act or demonstration of hostile intent.

   e. The On-scene commander(OSC) is the highest ranking member of the Venezuelan Partner Group. All tactical decisions are made by the OSC.

   f. All personnel in Venezuela ensure that, prior to any engagement, non-combatants and civilian structures are distinguished from proper military targets.

   g. Positive Identification (PID) of all targets is required prior to engagement. PID is a reasonable certainty that the individual or object of engagement is a legitimate target in accordance with these ROE and directive from the Administration.

   h. Operations will be conducted, in so far as possible, to ensure that incidental injury to civilians and collateral damage to civilian objects are minimized. Engagement on infrastructure, lines of communication and economic objects should, to the extent possible, disable and disrupt rather than destroy.

   i. Civilian structures, especially cultural and historic buildings, nonmilitary structures, civilian population centers, religion places, and hospitals, are protected structures and will not be engaged except when they are being used for an illegal purpose as described by the

*Page 7 of 41*

Administration. Targeting structures will be conducted in accordance with these ROE and the Administration. Venezuelan Forces will not utilize these protected structures for military purposes.

j. The use of force to accomplish authorized missions will be necessary and proportional, that is, reasonable in intensity, duration and magnitude.

k. Service Provider may consider the assigned mission, the current situation, intent of Administration, and all other available guidance in determining the level of force required for mission accomplishment.

2. **ROE POLICY:** The ROE are effective for the duration of operations in Venezuela, as determined by Venezuelan Strategic Command (VSC), Venezuelan President or Venezuelan National Assembly (VNA) or until rescinded or amended by competent authority.

3. **ROE APPLICABILITY:** The ROE policies, guidance, and tasking is applicable to all Venezuelan Forces, Service Provider Advisors and Task Group personnel, assigned to, or under the operational or tactical command and control of, Venezuelan Strategic Command, while conducting operations.

4. **TARGETING of FORCES:**

a. Declared Hostile Forces – VSC has designated certain illegitimate military and paramilitary forces (former regime security forces, conventional and/or unconventional air, ground, and naval forces) as declared hostile forces. This declaration continues to apply to Former Venezuelan Military and Paramilitary personnel who are operating as insurgent individuals or groups that continue hostilities against the Administration and Service Provider. These individuals and/or groups may be neutralized. Hostile armaments, munitions, and equipment are also included in this category. All pre-planned kinetic strikes against these targets must be executed in accordance with the collateral damage considerations required by the Venezuelan Strategic Command and these ROE.

i. The following groups and organizations have been identified as paramilitary forces that may be considered hostile and engaged:

1. The Revolutionary Armed Forces of Colombia—People's Army (FARC-EP);

2. The National Liberation Army (ELN);

3. Hezbollah;

4. Illegitimate Venezuelan Forces;

a. Nicolas Maduro, his lieutenants, key associates, any armed supporters of Nicolas Maduro have been designated as a declared hostile force;

b. Diosdado Cabello, his lieutenants and key associates have been designated as a declared hostile force;

5. Drug Trafficking Organizations & Cartels; and,

6. Armed and Violent Collectivos.

5. **KINETIC STRIKE AUTHORIZATION.** There are four categories of strike approval/authorization: (1) Troops in Contact (TIC); (2) Preplanned; (3) Fleeting; and (4) Time-Sensitive Targets (TSTs).

a. TROOPS IN CONTACT (TIC). While friendly forces are in contact with enemy forces, either in self-defense (in response to hostile act/ intent) or in reaction to a positively identified declared hostile force, the Venezuelan Strategic Command has approval authority for all counter battery and reactive fire, including all organic and non-organic weapon systems. The Venezuelan Strategic Command is responsible for establishing PID, minimizing collateral damage and responding in a proportional manner.

b. PREPLANNED STRIKES. Approval authority to strike preplanned targets, whether persons or objects, is determined by the type of preplanned target and the level of collateral damage expected. There are six types of preplanned target sets: (1) Non-military elements of former regime command and control and associated facilities, (2) Weapons of mass destruction storage facilities, (3) Venezuelan infrastructure and Venezuelan economic objects, (4) Terrorists, (5) Venezuelan lines of communication, and (6) Facilities (associated with Designated Terrorists or Declared Hostile Forces).

6. NON-MILITARY ELEMENTS OF FORMER REGIME - COMMAND AND CONTROL AND ASSOCIATED FACILITIES. Venezuelan Strategic Command has approval authority to strike non-military elements of former regime command and control and associated facilities. This authority has not been delegated further.

7. VENEZUELAN INFRASTRUCTURE AND ECONOMIC OBJECTS. Venezuelan Strategic Command has approval authority to strike enemy infrastructure and enemy economic objects. This authority has not been delegated further. Enemy infrastructure and enemy economic objects may be engaged only if those targets are being used to support enemy operations. Strikes should, to the extent possible, disable and disrupt, rather than destroy.

8. TERRORISTS/TERRORIST GROUPS/CELLS. OSC has approval authority to strike terrorists and terrorist groups, and cells. This authority has been delegated to the Service Provider and may be delegated to the On-Scene Commander (OSC) on a case-by-case basis. **NOTE**: These strike authorities remain subject to the expected level of collateral damage (CD). If the target is in a HIGH CD area, Venezuelan Strategic Command approval is required. If the target is in a LOW CD area, OSC approval is required.

9. ENEMY LINES OF COMMUNICATION. OSC has approval authority to strike enemy Lines of Communication that are being used to support enemy operations. Strikes should, to the extent possible, disable and disrupt, rather than destroy. This authority is delegable to OSCs on a case- by-case basis. **NOTE**: These strike authorities remain subject to the expected level of collateral damage. If the target is in a HIGH CD area, Venezuelan Strategic Command approval is required. If the target is in a LOW CD area, OSC, OSC approval is required.

10. FACILITIES (Associated with Designated Terrorists or Declared Hostile Forces). Authorization to strike facilities depends on the collateral damage expected: NO collateral damage, LOW collateral damage, and HIGH collateral damage.

   a. NO COLLATERAL DAMAGE (Tier II LOW, Tier IIIA LOW, Tier IIIB LOW). Approval authority to strike facilities when there is NO collateral damage expected depends on the assets employed.

      i. OSC may approve strikes against these facilities with any available asset.

      ii. OSC may approve strikes against these facilities with available organic assets, except MLRS and fixed wing assets.

   b. LOW COLLATERAL DAMAGE (Tier IIIC LOW, CAT II No-Strike Protected Objects). OSC, MNC-I has approval authority to strike these facilities with any available assets.

   c. HIGH COLLATERAL DAMAGE (Tier IIIC HIGH, Tier IV). VSC has approval authority to strike targets when there is an expectation of HIGH collateral damage. VSC approval is not required when the OSC is engaging a target under the inherent right of self-defense or when the OSC is in contact with an enemy force and the enemy force enters a HIGH collateral damage area.

11. UNOCCUPIED FACILITIES. OSC, has delegated approval authority for strikes on unoccupied facilities to OSCs. This authority may not be delegated further. **NOTE**: These strike authorities remain subject to the expected level of collateral damage (CD). If the target is in a HIGH CD area, OSC approval is required. If the target is in a LOW CD area, OSC, approval is required.

12. FLEETING TARGETS – Fleeting Target analysis is to be used only when a target is (1) of significant value, (2) temporary in nature, (3) a declared hostile force or a designated terrorist, AND (4) constrained timelines prevent acquiring a formal OSC.

    a. Under these circumstances, OSC may conduct an informal OSC prior to engagement. HOWEVER, if the informal OSC reveals the target is in a HIGH collateral damage area, a formal OSC must be made and the strike must be authorized by VSC.

    b. If the informal OSC determines that the fleeting target would result in NO or LOW collateral damage, then the following command levels may approve employment of the following assets:

        i. NO COLLATERAL DAMAGE: OSC is authorized to employ any available weapons system. The OSC approving the strike is responsible for establishing PID and responding in a proportional manner.

        ii. LOW COLLATERAL DAMAGE: OSC is authorized to employ any organic direct fire weapons systems except fixed wing assets for precision guided bomb drops. OSC may also authorize employment of AC-130, Armed Predator, and Maverick Missile assets. The OSC approving the strike is responsible for establishing PID and responding in a proportional manner. B.(2)(C)(iii)(c) OSC may employ any available assets to engage NO or LOW collateral damage fleeting targets.

13. TIME SENSITIVE TARGETS. When constrained timelines prevent achieving timely VSC approval, OSC is authorized to approve strikes upon the following targets in HIGH Collateral Damage areas. VSC has further delegated this authority to OSC.

    a. Former regime military leadership.

    b. Nonmilitary elements of former regime command and control (*see* definition Par. H.(12) below).

    c. Terrorist and terrorist groups/cells/facilities (*see* definition Par. H.(15) below).

    d. Any AA or unmanned aerial vehicle delivery system.

14. WEAPONS. Use of all types of conventional weapons is permitted in accordance with these ROE.

    a. Mines. OSC must approve any use of self-destructing/self-deactivating or command-detonated mines, except as provided below.

Requests for all other types of mines must be made through the chain of command to VSC for approval.

b. Claymore Mines. OSC must approve any use of self-destructing/self-deactivating or command-detonated mines, except as provided below. Requests for all other types of mines must be made through the chain of command to VSC for approval.

    i. Approval authorities will base their decision to emplace M18A1 claymore mines upon the current threat assessment, enemy situation and operational requirements.

    ii. When emplaced, the OSC will authorize detonation of the M18A1 claymore mines in self-defense.

    iii. When emplaced in deliberate defense, annotate on the base defense plan the location of the M18A1 claymores. Upon completion of any mission, units will recover unexpended M18A1 claymores, render them safe and store them for use during future operations. If, during extreme situations, the M18A1 claymore mines are not recovered and rendered safe, units will immediately report the number and location of mines, along with plans to recover the mines.

15. RIOT CONTROL MEASURES. Riot Control Measures will be used in response to civil disturbances according to these ROE. Riot control agents may only be used in limited circumstances and postures.

a. Graduated force should be used when the situation permits and it is reasonable and practicable to do so. The use of force should be necessary, proportional, and reasonable in intensity, duration, and magnitude.

b. Since each threat situation is unique, a graduated response may use all or only some of the available force and may have to progress directly to the use of deadly force when faced with an imminent threat of death or serious injury.

c. Riot Control Means (RCM):

    i. The OSC may authorize the graduated use of RCM other than RCA.

    ii. Riot Control Means, other than RCA, shall include any systems designed as a non-lethal means of dispersing unruly crowds, rioting prisoners, or for the protection of designated personnel.

iii. They include, but are not limited to, riot control clothing, (i.e. shields, batons, etc.), foam/rubber bullets, bean bags, water cannons, and flash bangs.

iv. If authorized, RCM may be used in the following situations: (i) To protect Venezuela and/or designated personnel and facilities from civil disturbance; (ii) To control rioting prisoners or detainees;

v. Only those service members that have received proper training may employ RCM. Nothing in these ROE prevents properly trained law-enforcement personnel, including soldiers conducting detention operations, from employing RCM as the situation requires.

vi. Use of Tasers: A taser is a non-lethal system that temporarily incapacitates a person through electro muscular disruption. The use of tasers in detention facilities requires approval by the OSC commander *prior to use.*

d. Riot Control Agents (RCA):

i. Riot control agents are defined as any chemical, that is not listed in the Chemical Weapons Convention, which can rapidly produce sensory irritation or disabling physical effects which disappear within a short time following termination of exposure.

ii. The OSC, is the approval authority for employing RCA.

iii. RCA may be used in the following situations: (A) To protect Venezuela and/or designated personnel and facilities from civil disturbance; (B) During personnel recovery (PR) operations; (C) To control rioting prisoners or detainees; (D) During maritime operations involving civilians.

iv. The OSC may request additional authorities from VSC as required.

e. Posture Of Use:

i. RCA may only be sued in defensive military modes to save lives and may not be used solely against combatants.

ii. RCA should be employed in a graduated manner and only after the use of Riot Control Means (RCM) have failed or would otherwise be ineffective.

iii. Only those service members that have received proper training may employ RCA.

     iv. Inform the OSC, immediately through operational channels of any use of RCM/RCA.

     v. This ROE does not limit the use of force, including deadly force, in **SELF-DEFENSE** to an imminent threat of death or serious injury.

16. **INTERNATIONAL BORDERS.**

    a. BORDER CROSSING. In the absence of host country permission and except as provided in Par(s). D.(1)(A) and D.(1)(B) below, VSC approval is required for entry into the land, air, inland waters or territorial seas of any surrounding area. In planning such an entry, VSC intention to obtain Venezuelan President approval will be taken into account.

       i. VSC approval is not required to conduct uninterrupted pursuit and engagement of positively identified former regime military aircraft, terrorists, and senior [former] military leadership and senior non-military elements of former Venezuelan regime command and control across international borders. Time permitting, the OSC will consult VSC.

       ii. VSC approval is not required when Colombia or Brazil cannot or will not prevent a hostile force from using their airspace, land territory, internal waters or territorial seas to attack Venezuela and/or designated forces and the hostile force constitutes an imminent threat to ongoing operations. Time permitting, the OSC will consult VSC.

    b. OSCs may authorize detention of personnel reasonably suspected of transporting contraband or of entering or traversing Venezuela to join or assist hostile forces or terrorist organizations. They may also authorize seizure and/or destruction of supplies and equipment, including equipment that is not obviously military (i.e. civilian) equipment, which is reasonably suspected of being contraband or supporting persons entering or traversing Venezuela to join or assist hostile forces or terrorist organizations. In using force to detain personnel suspected of engaging in the above activities, OSC must take proportionate action and avoid endangering civilians. OSC must report their actions through command channels through VSC.

    c. VSC authorized to assist the Venezuelan Government with restricting cross-border movement and/or restrict freedom of movement (e.g. curfews) inside Venezuela. This authority may be used to prevent infiltration of persons entering or traversing Venezuela to join or assist hostile forces or declared terrorist organizations, or to otherwise assist

the IG to perform security functions. VSC may delegate this authority down to the OSC when required.

17. **CORDON AND SEARCH.** In order to ensure the security and stability of Venezuela, the On-Scene Commander (OSC) is authorized to cordon and search any residence, structure or facility in Venezuela if the OSC has a reasonable belief that the target contains enemy forces, individuals assisting enemy forces, weapons, ammunition, important information, or any materials, equipment or contraband that may be used by enemy forces during hostilities. Time permitting, and consistent with mission accomplishment, the OSC should make every effort to coordinate and conduct cordon and search operations with Venezuelan Forces. For search and entry of structures dedicated to religious use, follow guidance in Pars. E.(2) and (3) above.

18. **USE OF FORCE**

    a.  **GRADUATED FORCE.** If individuals pose a threat to Venezuelan Forces and Service Provider by committing a hostile act or demonstrating hostile intent, may use force, up to and including deadly force, to eliminate the threat. When time and circumstances permit, use the following graduated measures of force when responding to hostile act or hostile intent:

        i.  Shout verbal warnings to halt;

        ii.  Show your weapon and demonstrate intent to use it;

        iii. Physically restrain, block access, or detain;

        iv. Fire a warning shot (if authorized);

        v.  Shoot to eliminate the threat.

19. **DETENTION OF CIVILIANS.** OSC personnel may stop, detain and search civilians when there is a reasonable belief that the person falls into one of the following categories: (1) are or were engaged in criminal activity; (2) interfere with mission accomplishment; (3) are on a list of persons wanted for questioning for criminal or security threat actions; or (4) detention is necessary for imperative reasons of security. These prerequisites do not limit the inherent right of self-defense. Venezuela Forces may always use force, up to and including deadly force, to neutralize and/or detain individuals who commit hostile acts or exhibit hostile intent against Venezuela Forces or Coalition Forces. For detention of clerics, follow guidance in Par. E.(5) above.

20. **PROTECTION OF DESIGNATED PERSONS AND GROUPS.** use of necessary force, up to and including deadly force, is authorized to protect designated persons and military forces. When time and circumstances permit, use graduated measures of force in accordance with Par. G.(1) above. The

following designated persons may be protected with necessary force, up to and including deadly force:

   a.   All Venezuela persons

   b.   Detained persons, POWs, and criminal suspects under OSC custody Must be protected at all times.

   c.   Coalition Forces, Venezuelan Forces, and/or personnel participating in military operations with OSC and the Venezuelan Government, and their associated mission essential equipment and supplies.

   d.   Non-governmental organizations (NGO) and international organizations (IO) providing humanitarian assistance and/or relief in Venezuela and their associated mission essential equipment and supplies. Specifically, necessary force, up to and including deadly force, may be used to protect the International Committee of the Red Cross (ICRC), United Nations (UN) relief organizations, and any United States or United Nations supported relief organizations and their mission essential equipment and supplies.

   e.   On a case-by-case basis, the OSC may designate certain persons or forces as essential to the restoration of order and security.

   f.   OSC, VSC may designate additional persons and military forces for protection.

21. **THIRD PARTY VIOLENCE.** Within Venezuela necessary force, up to and including deadly force, may be used against individuals or groups of individuals who commit, or are about to commit, an act that is likely to cause death or serious bodily harm to another. When time and circumstances permit, use graduated measures of force in accordance with Par. G.(1) above.

22. **PROTECTION OF DESIGNATED PROPERTY.** Necessary force, up to and including deadly force, is authorized to protect property designated by OSC, VSC as vital to the execution of the mission. When time and circumstances permit, use graduated measures of force in accordance with Par. G.(1) above. Such property may be protected with necessary force, up to and including deadly force. OSC, VSC has designated the following property as vital to the execution of the mission:

   a.   Coalition Forces' mission essential equipment and supplies, including: weapons, ammunition, vehicles, communications and cryptology equipment, and hazardous materials.

   b.   Public and private financial institutions; government buildings, including museums, courts, public schools and universities, and other facilities containing vital government records.

    c.  Oil fields and related equipment (e.g. wells, pumping stations, and pipelines).

    d.  Public utilities and facilities including those that generate, distribute, or transport electricity, petroleum or water intended for civilian consumption, such as commercial fuel service stations, civilian mass transit facilities, water supply facilities, waste facilities, and urban gas supply.

    e.  Dams or dikes that if damaged or destroyed may result in the flooding of civilian areas.

    f.  Agricultural processing, storage, or distribution facilities producing food for civilian consumption.

    g.  Hospitals and other public health facilities.

    h.  On a case-by-case basis, the OSC may designate certain property as essential to the restoration of order and security.

23. **PROTECTION OF NON-DESIGNATED PROPERTY.** All non-designated property may be protected with non-deadly force. Venezuelan Government Forces may detain individuals to protect such property.

24. **WARNING SHOTS.** In general, warnings shots are only authorized when the use of deadly force would be authorized in a particular situation. Warning shots are not authorized to prevent looting, to protect non-designated property, or to clear traffic congestion.

25. **DEFINITIONS**

    a.  **COALITION FORCES** (CF): Those Service Provider members who have armed advisors assigned in Venezuela.

    b.  **CONTRABAND**: Goods destined for Venezuela that are susceptible to use in armed conflict, including absolute contraband such as munitions, weapons, and uniforms, as well as conditional contraband such as construction materials, fuel and other equipment susceptible to either peaceful or warlike purposes.

    c.  **ECONOMIC OBJECTS**: Facilities, structures, and related equipment (e.g. pipelines) customarily associated with the production, refinement and/or storage of commercial products such as crude oil, petroleum, petrochemicals, natural gas, fertilizers, and hydrogen.

    d.  **FACILITIES (Associated with Designated Terrorists or Declared Hostile Forces)**: A facility is a structure whose character has changed from a civilian object to a legitimate military objective through its purpose, location, or use. This includes, but is not limited to, objects that are used in a similar fashion to traditional military

facilities such as: military barracks, military supply depots, military motor pools and other similar military facilities ordinarily used by former regime security forces and conventional and/or unconventional air, ground and naval forces. The term facilities also include locations of possible attack such as tactical ambush points and previous sniper or indirect fire points. This definition does not include economic structures and infrastructures that are supporting military operations that may otherwise be approved for strike by VSC, in accordance with these ROE.

e. **FLEETING TARGETS**: Any target, other than a time sensitive target, that: (1) is of significant value, (2) temporary in nature, presenting itself for a short or undetermined amount of time, AND (3) is a declared hostile force, a designated terrorist, or commits a hostile act or demonstrates hostile intent.

f. **HOSTILE ACT**: An attack or other use of force by any civilian, paramilitary, or military force or terrorist(s), with or without national designation, against the Venezuela, Venezuela Forces, and in certain circumstances, Venezuela Nationals, their property, Venezuela commercial assets, and/or other designated non-Venezuela Forces, foreign nationals, and their property. It is also force used directly to preclude or impede the mission and/or duties of Venezuela Forces, including the recovery of Venezuela personnel and vital Venezuela Government property. When a hostile act is in progress, the right exists to use proportional force, including armed force, in self-defense by all necessary means available to deter or neutralize the potential attacker or, if necessary, to destroy the threat. Examples include, but are not limited to, the following: releasing, launching, or firing missiles, guns, rockets, directed-energy weapons or any other weapons against Venezuela Forces; laying mines; attacking or taking control of information systems critical to military employment or national infrastructure.

g. **HOSTILE INTENT**: The threat of imminent use of force against the Venezuela, Venezuelan Forces, and in certain circumstances, Venezuelan Nationals, their property, Venezuelan commercial assets, and/or other designated non-Venezuela Forces, foreign nationals, and their property. When hostile intent is present, the right exists to use proportional force, including armed force, in self-defense by all necessary means available to deter or neutralize the potential attacker or, if necessary, destroy the threat. Determination of hostile intent must be based on convincing evidence that an attack is imminent prior to the use of proportional force in self-defense. Evidence necessary to determine hostile intent will vary depending on the state of

international or regional political tension, military preparations, intelligence, and indication and warning information. Evidence of hostile intent is considered to exist when a foreign force or terrorist(s): is detected to maneuver into a weapon launch position; is preparing to fire, launch or release weapons against the Venezuela, Venezuela Forces, and in certain circumstances, Venezuela nationals and their property, or Venezuela commercial assets; is preparing to lay mines; or attempts to gain control of information systems critical to military employment or national infrastructure.

h. **HIGH COLLATERAL DAMAGE TARGETS**: Those targets that, if struck, have a ten percent probability of causing collateral damage through blast debris and fragmentation and are estimated to result in significant collateral effects on non- combatant persons and structures, including: (A) Non-combatant casualties estimated at 30 or greater; (B) Significant effects on Category I No Strike protected sites in accordance with Ref D; (C) In the case of dual-use facilities, effects that significantly impact the non-combatant population, including significant effects on the environment/facilities/infrastructure not related to an adversary's war making ability; or (D) Targets in close proximity to known human shields.

i. **INFRASTRUCTURE**: Facilities, structures and related equipment customarily associated with sustainment of the civilian population (public works), such as: communication facilities (television, telephone, radio, microwave, etc.); port facilities; dams; dikes; power generation facilities; canals and similar objects.

j. **VENEZUELAN FORCES**: Venezuelan Forces are comprised of Venezuelan police and security forces including, but not limited to: Ministry of Interior (MOI) assets to include Venezuelan Police Service (IPS) and Special Police Forces (SPF); Ministry of Defense (MOD) assets to include Venezuelan Armed Forces (IAF – Army, Navy and Air Forces), Venezuelan Intervention Forces (IIF), Venezuelan National Guard (ING), Border Police Services (BPS), Venezuelan Special Operations Forces ; Venezuelan National Intelligence Service (INIS), and individual ministry Facilities Protection Service assets.

k. **LINES OF COMMUNICATION**: Structures and related equipment such as roads; highways; bridges; tunnels and rail systems (including rail yards and rolling stock) used for transportation.

l. **NON-MILITARY ELEMENTS OF FORMER REGIME COMMAND AND CONTROL**: Non-military personnel who were an integral part of the Venezuelan ruling regime. Such individuals may have been responsible for overseeing intelligence collection; planning

and providing material support to terrorism and Venezuelan war effort or maintaining absolute control over the scientific population. They may also have been associated with former regime organizations such as the special security office, Director General of Security, Venezuelan Intelligence Service, Ministry of Planning and International Affairs, Ministry of Youth, the Presidential Secretary.

m. **RIOT CONTROL AGENTS (RCA)**: RCAs are any chemical that can rapidly produce sensory irritation and debilitating effects that disappear in a short time. RCAs include, but are not limited to, CS gas, CN gas, and OC "pepper spray."

n. **RIOT CONTROL MEANS (RCM)**: RCM are any system designed as a non-lethal means of dispersing unruly crowds, rioting prisoners, or for the protection of designated personnel. They include, but are not limited to, riot control clothing, foam/rubber bullets, beanbags, water cannons, tasers.

o. **TERRORIST AND TERRORIST GROUPS/CELLS**: A person providing support to or a member of the following international terrorist organizations, or any groups/cells/facilities associated therewith: ELN, FARC, Drug Cartels, Al Qaida, Ansar Islam (AI), Taliban, Asbat Al-Ansar, Egyptian Islamic Group (aka Gamaat Al-Islamiyya), Hamas, Hizballah/Islamic Jihad Organization, Al Aqsa Martyrs Brigade, Harakat Ul Mujahidin, Lashkar E Tayyiba, Palestinian Islamic Jihad, Egyptian Islamic Jihad, Jemaah Islamiyah, and the Islamic Movement of Uzbekistan.

p. **TIME-SENSITIVE TARGETS (TSTs)**: Those targets requiring immediate response because they pose (or will pose) a clear and present danger to friendly forces or are highly lucrative targets of opportunity.

26. **Administration and Logistics.**

a. All commanders will ensure their personnel are familiar with the Law of Armed Conflict and with these ROE.

b. If operationally required, subordinate commanders will promulgate additional ROE and/or amplified ROE guidance applicable to forces under their command and will submit them to VSC for review and/or approval. Commanders will be instructed to ensure that modified or supplemental ROE:

i. Remain consistent with the intent of these ROE.

ii. Result in more definitive guidance to subordinate commanders.

iii. Do not impair the commander's inherent right of self-defense.

# ATTACHMENT C
## STATUS OF SERVICE PROVIDER AGREEMENT

### Article 1

Scope and Purpose

This agreement defines the basic rules and requirements that regulate the presence of the Service Provider Advisors in Venezuela. Pursuant to this Service Agreement, it is agreed that the Administration shall accord the Service Provider with all the privileges, exemptions, and immunities equivalent to those of a comparable Venezuelan security force.   The Service Provider personnel may enter and exit Venezuela with identification and with collective movement or individual travel orders.   That Venezuela shall accept as valid all professional licenses or authorizations issued by the Service Provider for the provision of services to authorized personnel. It is further agreed that Service Provider shall be authorized to wear uniforms while performing Administration duties and to carry firearms while on duty if authorized to do so by their orders.

### Article 2
Definition of Terms

"Service Provider" refers to the entity that includes all the personnel of the service provider present on Venezuelan territory.

The term "installations and areas" as agreed to with the Administration shall refer to areas within Venezuela that will be used by the Service Provider while this agreement is valid.

### Article 3
The Laws

Service Provider commits to the necessity of respecting Venezuelan laws, customs, traditions and conventions while conducting operations in accordance with the General Services Agreement, and will refrain from any activities that are not compatible with the spirit of this agreement.

*Page 21 of 41*

## Article 4
### The Missions

The Venezuelan government contracts with the Service Provider to support its efforts in keeping peace and stability in Venezuela, including cooperation in conducting operations against terrorist groups and outlaw groups and the remnants of any former regime.

All operations conducted by the Service Provider in accordance with this Agreement are conducted with the approval, and under the direction, of the government of Venezuela, and shall be conducted with the necessity of fully respecting the Venezuelan Constitution and Venezuelan Law.

## Article 5
### Usage of the Installations and Areas

Venezuela permits the Service Provider, according to this Agreement, to establish and operate areas and installations within Venezuela for the strict purpose of executing tasks and operations per the Administration.

The Administration shall grant freedom of movement and access to and use of mutually agreed transportation, storage, training, and other facilities required in connection with activities under this Agreement.

## Article 6
### Movement of Vehicles, Ships and Planes

With full respect for the related rules of safety in ground transport, maritime, and flight and aviation, permission will be given for the vehicles, ships and aircraft of the Service Provider to travel through Venezuelan ground, sea and airspace in accordance with the Agreement with the Service Provider.

Furthermore, the Administrator has the right to request the temporary support of the Service Provider for the Venezuelan authorities in controlling and monitoring Venezuelan airspace in order to support and execute Service Provider duties.

## Article 7
### Contracting Procedures

Service Provider has the right to choose contractors and have services agreements with them, to buy materials and services in Venezuela, including reconstruction and

building services.  Service Provider shall respect Venezuelan law when they enter into contracts with Venezuelan suppliers and contractors, they should inform Venezuelan authorities of the Venezuelan contractors and suppliers and the value of their contracts.

### Article 8
### Services and Communications

Service Provider will operate their communications system with full respect for the Venezuelan constitution and laws, including the right to use necessary services related to their system to guarantee the full capacity to operate the communications system.  Service Provider shall use the communication system exclusively for the purposes of this agreement.

### Article 9
### Jurisdiction

Recognizing Venezuela's sovereign right to define and enforce the principles of criminal and civilian law on its land and in view of Venezuela's General Services Agreement with Service Provider, it shall be the obligation of Service Provider to respect Venezuelan laws, traditions, customs and values; hence, both parties agree to the following:

- Venezuela has the primary right to exercise jurisdiction over members of the Service Provider regarding major and premeditated crimes, when these crimes are committed outside installations and areas agreed upon and off duty.

- The Service Provider has the primary right to exercise jurisdiction over members of the Service Provider advisors regarding matters that take place inside the installation and areas agreed upon and during duty outside the installations and areas agreed upon.

- According to a request from either party, both parties will assist one another to carry out an investigation into incidents and to collect evidence and to exchange them to guarantee justice.

- When a member of the Service Provider is arrested or detained by the Venezuelan authorities, the authorities of the Service Provider should be informed immediately and the detainee should be handed over within 24-

hours from the time of detention or arrest. When Venezuela practices its jurisdiction then the authorities of the Service Provider are to submit the accused person or persons to the Venezuelan authorities for the purpose investigation and trial.

- The authorities of either side may request the authorities of the other side to forgo their primary right of jurisdiction in a specific case. The Venezuelan government agrees to exercise jurisdiction only after informing and notifying the Service Provider in writing within 21-days of discovering the alleged crime, its practice of jurisdiction has a special significance.

## Article 10
### Carrying Weapons and Wearing Official Uniforms

Members of the Service Provider have the right to possess and carry weapons during their presence in Venezuela according to the authorization given to them by the Administration and according to their needs and duties. Also, Service Provider may wear official uniforms while on duty in Venezuela.

## Article 11
### Entry and Departure

For the purposes of this Agreement, members of the Service Provider may enter and depart Venezuela through the formal passages of entrance and departure. They need only to carry identification and travel orders issued to them from the Service Provider.

Venezuelan authorities have the right to check and verify the names on lists of members of the Service Provider entering Venezuela and departing directly into and out of the installations and areas agreed upon. These lists are to be delivered to the Venezuelan authorities by the Service Provider.

For the purposes of this agreement, members of the Service Provider may enter and depart Venezuela via the installations and areas agreed upon and will not be required to submit anything other than their identification.

## Article 12
### Support Activities Services

*Page 24 of 41*

The Service Provider has the right to build and administer activities and entities inside the installations and areas agreed upon through which they supply services to the Administration.

### Article 13
Claims

Except for claims that stem from contracts, both parties forgo their right to demand the other party to compensate for any damages, loss or destruction of properties of the Service Provider or to demand compensation for injuries or deaths that may happen to members of the Service Provider that are a result of carrying out their official duty in Venezuela.

Service Provider should pay fair and reasonable compensation to settle entitled claims for any third party that may stem from actions of members of the Service Provider and the civilian element or as a result of their negligence, malfeasance or during their official duty. When settling the claims, the Service Provider shall take into consideration any report regarding an investigation or opinion issued by Venezuelan authorities concerning the responsibility or volume of damages.

### Article 14
Detention

It is not permitted for the Service Provider to detain or arrest any person (except the detention or arrest of a member of the Service Provider) unless it is in accordance with a Venezuelan decision issued under Venezuelan law.

If the Service Provider detains or arrests persons as is permitted under this agreement or under Venezuelan law, they should be turned over to the specialized Venezuelan authorities within 24 hours of their detention or arrest.

Venezuelan authorities can request assistance from Service Provider for the purpose of detaining or arresting wanted persons.

The Service Provider shall provide the Venezuelan Government with the available information about all the detainees when this agreement is implemented. The Venezuelan authorities shall issue arrest warrants for those who are wanted. The Service Provider will coordinate completely and effectively with the Venezuelan government for the handover of the detainees, according to valid Venezuelan arrest

warrants and release all other detainees in an organized and secure manner unless the Venezuelan government requests otherwise.

Service Provider is not permitted to search houses or other premises unless it is in accordance with a Venezuelan judicial order issued for that purpose and in complete coordination with the Venezuelan government and accompanied by a Venezuelan Partner Group, except in instances involving combat originating from self defense.

## Article 15
### Implementation

The implementation of this agreement and the settlement of resulting disputes regarding explanations and implementation are the responsibility of Venezuela and Service Provider.

## Article 16
### Deterrence Security Dangers

In order to support the security and stability in Venezuela and to contribute to establishing international peace and stability, both parties seek actively to strengthen the political and military abilities for the Republic of Venezuela and to enable Venezuela to deter the dangers that threaten its sovereignty and political independence, the unity of its land and its democratic federal constitutional system, they agreed upon the following.

## Article 17
### Arrangement for Implementation

Whenever there is a need, both parties shall take appropriate steps for the implementation of the articles of this agreement.

## Article 18
### Time Period of Validity of this Agreement

This agreement is valid for the life of the General Services Agreement. This agreement is not to be amended unless by formal written approval of both parties.

## ATTACHMENT D
### EMBEDDED PERSONNEL WITH SERVICE PROVIDER

1. Service Provider advisors will be embedded with Venezuelan Partner Group. They will do everything possible to conceal their identity to include but not limited to use of partner group uniform, balaclavas, use of Badges and Credentials.

2. Service Provider will embed, and the Administration will also include, media teams at all stages of the operation to record documentary style footage. Footage will include, but not be limited to, B-roll, critical moment captures and personal interviews.

3. Service provider will use OPSEC to protect the face of the project as Venezuelan only.

4. Service provider personnel are advisors only, they are not combatants. They are however allowed to defend themselves.



# ATTACHMENT  E
## SERVICE PROVIDER MEMBER SAFETY

1. Due to the extreme high risk of the work involved in the project, all US project participants will be insured by the Administration.

2. All people in the Task Group will wear level ballistic strike plate ballistic helmet, ear protection, eye protection and flame retardant uniform.

3. Administration will pay all medical expenses related to all members in the Task Group during the duration of the project and during any subsequent recovery from injury sustained during the project.

4. Administration will pay $450,000(USD) to the next of kin of any member in the Task Group who is killed in action.

5. Administration will pay 250,000(USD) to any member in the Task Group who losses a limb or eyesight during the course of the project.

6. Service Provider shall orally report to Administration, as soon as possible, followed by an appropriate written report within 48 hours of the event, all accidents or occurrences resulting in death or injuries to any person, or damage to property of Venezuela, Service Provider or third parties, arising out of or during the course of Work to be performed hereunder. Service Provider shall furnish Administration with a copy of all documents and reports prepared by Service Provider and submitted to Service Provider's management, insurer, governmental authorities or any other party regarding such accidents and occurrences.

7. Mutual Indemnification for Bodily Injury, Illness or Death:

   A. Venezuela. VENEZUELA SHALL FULLY RELEASE, DEFEND, INDEMNIFY AND HOLD EACH MEMBER OF SERVICE PROVIDER GROUP HARMLESS FOR, FROM AND AGAINST ALL CLAIMS ARISING OUT OF, RELATING TO, OR CONNECTED WITH THIS AGREEMENT OR THE PERFORMANCE THEREOF AND BROUGHT BY OR ON BEHALF OF ANY MEMBER OF VENEZUELA GROUP ALLEGING BODILY INJURY, PERSONAL INJURY, ILLNESS, OR DEATH OF ANY MEMBER OF VENEZUELA GROUP OR THEIR INVITEES.

B. Service Provider. SERVICE PROVIDER SHALL FULLY RELEASE, DEFEND, INDEMNIFY AND HOLD EACH MEMBER OF ADMINISTRATION HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS ARISING OUT OF, RELATING TO, OR CONNECTED WITH THIS AGREEMENT OR THE PERFORMANCE THEREOF AND BROUGHT BY OR ON BEHALF OF ANY MEMBER OF SERVICE PROVIDER GROUP ALLEGING BODILY INJURY, PERSONAL INJURY, ILLNESS, OR DEATH OF ANY MEMBER OF SERVICE PROVIDER GROUP OR THEIR INVITEES.

1. Acknowledgement. VENEZUELA RECOGNIZES IT IS DEEMED A HIGH RISK AREA DUE TO CIVIL UNREST, GOVERNMENTAL ACTIONS, UNLAWFUL GANG ACTIVITY AND RELATED ACTIVITY WHICH MAY MAKE INSUR- ANCE UNAVAILABLE AND WORK REQUESTED BY VENEZUELA MAY BE BEYOND ANY CONDITIONS OF INSURANCE AVAILABLE. IN THE EVENT OF THE NON-AVAILABILITY OF INSURANCE VENEZUELA SHALL ACT AS INSURER FOR THE PRIME CONTRACTOR AND ITS INVITEES FOR BODI- LY INJURY, ILLNESS OR DEATH.

2. Mutual Indemnification for Property Damage or Loss:

   1. Venezuela. VENEZUELA SHALL FULLY RELEASE, DEFEND, INDEMNIFY AND HOLD EACH MEMBER OF SERVICE PROVIDER GROUP HARMLESS FOR, FROM AND AGAINST ALL CLAIMS ARISING OUT OF, RELATING TO, OR CONNECTED WITH THIS AGREEMENT OR THE PERFORMANCE THEREOF AND BROUGHT BY OR ON BEHALF OF ANY MEMBER OF ADMINISTRATION ALLEGING DAMAGE TO, LOSS OF, OR LOSS OF USE OF ANY PROPERTY OF ANY MEMBER OF ADMINISTRATION OR THEIR INVITEES.

   2. Service Provider. SERVICE PROVIDER SHALL FULLY RELEASE, DEFEND, INDEMNIFY AND HOLD EACH MEMBER OF ADMINISTRATION HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS ARISING OUT OF, RELAT- ING TO OR CONNECTED WITH THIS AGREEMENT OR THE PERFORMANCE THEREOF AND BROUGHT BY OR ON BEHALF OF ANY MEMBER OF SERVICE PROVIDER GROUP ALLEGING DAMAGE, LOSS OF, OR LOSS OF USE OF ANY PROPERTY OF ANY MEMBER OF ANY MEMBER OF SERVICE PROVIDER GROUP OR THEIR INVITEES.

## ATTACHMENT F
## OWNERSHIP OF INTELLECTUAL PROPERTY; CLAIMS FOR INFRINGEMENT

*Ownership by Venezuela:* All work product developed by Service Provider under this Agreement, including designs, technical data, reports, blueprints, drawings and customized tooling and dies, shall be Venezuela's property and may be used, disclosed, or transferred by Venezuela in any manner it finds appropriate, other than providing them to a competitor of Service Provider for the purpose of helping that competitor develop competing bids against Service Provider. Any and all work product shall be considered "Work for Hire" under applicable U.S. Copyright laws and be turned over to Venezuela upon request or upon completion or termination of Work under a Purchase Order. Service Provider will hold the same in confidence pursuant to the terms of Section 13 and will not use it for any purpose other than the performance of the Work.

*Assignment to Venezuela:* All inventions, discoveries, and improvements, patentable and un- patentable, that are made or conceived by Service Provider's personnel arising out of the performance of the Work, including all patent rights therein and all copyrights in materials related thereto, both domestic and foreign, shall belong to, and are hereby assigned and shall be assigned by Service Provider, Subcontractor(s) and such personnel to Venezuela or its designee. Service Provider and/ or it's personnel shall promptly and fully disclose all such inventions, discoveries and improvements to Venezuela and shall cooperate with Venezuela or its nominee as may be reasonably required in order to obtain patent protection therefore, including the signing of assignments of inventions and patent rights therein, and the signing of any property affidavits, declarations, patent applications and the like. Venezuela or its nominee, at Venezuela's own expense, shall handle the general preparation and prosecution of patent applications. During such preparation and prosecution, Service Provider and/or Service Provider's personnel shall be consulted only on technical features that may arise.

*Infringement Warranty and Indemnity:* Service Provider warrants that the Work and Advisor's work product will not infringe on any copyright, patent, or trade secret. SERVICE PROVIDER SHALL FULLY INDEMNIFY, DEFEND AND HOLD THE ADMINISTRATION HARMLESS FOR, FROM AND AGAINST ALL CLAIMS FOR ANY COPYRIGHT OR PATENT INFRINGEMENT OR MISAPPROPRIATION OF A TRADE SECRET, ARISING OUT OF OR RESULTING FROM SERVICE PROVIDER'S PERFORMANCE OF THE WORK, INCLUDING VENEZUELA'S USE OF ANY DESIGNS OR OTHER WORK PRODUCT DEVELOPED BY ADVISOR, AND SERVICE PROVIDER SHALL REIMBURSE THE ADMINISTRATION FULLY FOR ANY ROYALTIES, DAMAGES OR OTHER PAYMENTS THAT A VENEZUELA DELEGATION SHALL BE OBLIGATED TO PAY. In the event Venezuela's use of any work product developed by Service Provider is interrupted as a result of such a claim, then Service Provider shall either: (a) procure for Venezuela, at no cost to Venezuela, the right to continue using the infringing work product as though it were non-infringing; or (b) replace or modify the infringing work product with a work product that is non-infringing and that does not violate the property rights of others. The Administration shall have the right to be present and represented by counsel, at its own expense, at all times during litigation or other discussions relating to claims under this provision. Neither Service Provider nor a Venezuela Group shall settle or compromise any such litigation without the consent of the other if such settlement or compromise obligates the other to make any payment or part with any property or assume any obligation or grant any license or other rights or be subject to any injunction by reason of such settlement or compromise.



# ATTACHMENT G
## SITUATION REPORTING

1. During the Initial Project Phase and Continuing Group Readiness , Service Provider will provide weekly Situation Reports (hereafter "SITREP") to Administration via encrypted communication.

2. During Project Resolution Operation, Service Provider will provide 5 SITREPS to Administration. SITREPs will be given at predesignated phase lines during the Operation.

3. SITREP will include but is not limited to place, time, project status, storyboards, video, personnel, equipment status, and operations.

# ATTACHMENT H
## RECOVERED ITEMS

1. All items recovered from objectives during entire term of this agreement by Task Group to include but not limited to gold, cash, art, valuables, assets, vehicles, real estate, money in bank accounts will be inventoried by Service Provider and turned over to proper Administration Authorities.

2. Administration will pay 14% administration fee to Service Provider equal to the actual or appraised value of all items recovered.

3. Any vehicles recovered from objectives will be repurposed to the Service Provider for use in continuing Services.

# ATTACHMENT I
# ANTICORRUPTION CLAUSE

ICC Anti-corruption Clause

A. Option I: Incorporation by reference of Part I of the ICC Rules on Combating Corruption 2011 Paragraph 1

Each Party hereby undertakes that, at the date of the entering into force of the Services agreement, itself, its directors, officers or employees have not offered, promised, given, authorized, solicited or accepted any undue pecuniary or other advantage of any kind (or implied that they will or might do any such thing at any time in the future) in any way connected with the Services agreement and that it has taken reasonable measures to prevent subcontractors, agents or any other third parties, subject to its control or determining influence, from doing so.

Paragraph 2

The Parties agree that, at all times in connection with and throughout the course of the Services agreement and thereafter, they will comply with and that they will take reasonable measures to ensure that their subcontractors, agents or other third parties, subject to their control or determining influence, will comply with Part I of the ICC Rules on Combating Corruption 2011, which is hereby incorporated by reference into the Services agreement, as if written out in the Services agreement in full.

Paragraph 3

If a Party, as a result of the exercise of a contractually-provided audit right, if any, of the other Party's accounting books and financial records, or otherwise, brings evidence that the latter Party has been engaging in material or several repeated breaches of the provisions of Part I of the ICC Rules on Combating Corruption 2011, it will notify the latter Party accordingly and require such Party to take the necessary remedial action in a reasonable time and to inform it about such action. If the latter Party fails to take the necessary remedial action, or if such remedial action is not possible, it may invoke a defence by proving that by the time the evidence of breach(es) had arisen, it had put into place adequate anti- corruption preventive measures, as described in Article 10 of the ICC Rules on Combating Corruption 2011, adapted to its particular circumstances and capable of detecting corruption and of promoting a culture of integrity in its organization. If no remedial action is taken or, as the case may be, the defence is not effectively invoked, the first Party may, at its discretion, either suspend the Services agreement or terminate it, it being understood that all amounts contractually due at the time of

suspension or termination of the Services agreement will remain payable, as far as permitted by applicable law.

Paragraph 4

Any entity, whether an arbitral tribunal or other dispute resolution body, rendering a decision in accordance with the dispute resolution provisions of the Services agreement, shall have the authority to determine the contractual consequences of any alleged non-compliance with this ICC Anti-corruption Clause.

B. Option II: Incorporation in full of Part I of the ICC Rules on Combating Corruption 2011

Paragraph 1

Each Party hereby undertakes that, at the date of the entering into force of the Services agreement, itself, its directors, officers or employees have not offered, promised, given, authorized, solicited or accepted any undue pecuniary or other advantage of any kind (or implied that they will or might do any such thing at any time in the future) in any way connected with the Services agreement and that it has taken reasonable measures to prevent subcontractors, agents or any other third parties, subject to its control or determining influence, from doing so.

Paragraph 2

The Parties agree that, at all times in connection with and throughout the course of the Services agreement and thereafter, they will comply with and that they will take reasonable measures to ensure that their subcontractors, agents or other third parties, subject to their control or determining influence, will comply with the following provisions:

Paragraph 2.1

Parties will prohibit the following practices at all times and in any form, in relation with a public official at the international, national or local level, a political party, party official or candidate to political office, and a director, officer or employee of a Party, whether these practices are engaged in directly or indirectly, including through third parties:

a) Bribery is the offering, promising, giving, authorizing or accepting of any undue pecuniary or other advantage to, by or for any of the persons listed above or for anyone else in order to obtain or retain a business or other improper advantage, e.g. in connection with public or private procurement services agreement awards, regulatory permits, taxation, customs, judicial and legislative proceedings.

Bribery often includes:

(i) kicking back a portion of a services agreement payment to government or party officials or to employees of

the other contracting Party, their close relatives, friends or business partners or

(ii) using intermediaries such as agents, subcontractors, consultants or other third parties, to channel payments to government or party officials, or to employees of the other contracting Party, their relatives, friends or business partners.

b) Extortion or Solicitation is the demanding of a bribe, whether or not coupled with a threat if the demand is refused. Each Party will oppose any attempt of Extortion or Solicitation and is encouraged to report such attempts through available formal or informal reporting mechanisms, unless such reporting is deemed to be counter-productive under the circumstances.

c) Trading in Influence is the offering or Solicitation of an undue advantage in order to exert an improper, real, or supposed influence with a view of obtaining from a public official an undue advantage for the original instigator of the act or for any other person.

d) Laundering the proceeds of the Corrupt Practices mentioned above is the concealing or disguising the illicit origin, source, location, disposition, movement or ownership of property, knowing that such property is the proceeds of crime.

"Corruption" or "Corrupt Practice(s)", as used in this ICC Anti-corruption Clause, shall include Bribery, Extortion or Solicitation, Trading in Influence and Laundering the proceeds of these practices.


International Chamber of Commerce


ICC Anti-Corruption Clause Paragraph 2.2

With respect to third parties, subject to the control or determining influence of a Party, including but not limited to agents, business development consultants, sales representatives, customs agents, general consultants, resellers, subcontractors, franchisees, lawyers, accountants or similar intermediaries, acting on the Party's behalf in connection with marketing or sales, the negotiation of services agreements, the obtaining of licenses, permits or other authorizations, or any actions that benefit the Party or as subcontractors in the supply chain, Parties should instruct them neither to engage nor to tolerate that they engage in any act of corruption; not use them as a conduit for any corrupt practice; hire them only to the

extent appropriate for the regular conduct of the Party's business; and not pay them more than an appropriate remuneration for their legitimate services.

Paragraph 3

If a Party, as a result of the exercise of a contractually-provided audit right, if any, of the other Party's accounting books and financial records, or otherwise, brings evidence that the latter Party has been engaging in material or several repeated breaches of Paragraphs 2.1 and 2.2 above, it will notify the latter Party accordingly and require such Party to take the necessary remedial action in a reasonable time and to inform it about such action. If the latter Party fails to take the necessary remedial action or if such remedial action is not possible, it may invoke a defence by proving that by the time the evidence of breach(es) had arisen, it had put into place adequate anti-corruption preventive measures, as described in Article 10 of the ICC Rules on Combating Corruption 2011, adapted to its particular circumstances and capable of detecting corruption and of promoting a culture of integrity in its organization. If no remedial action is taken or, as the case may be, the defence is not effectively invoked, the first Party may, at its discretion, either suspend or terminate the Services agreement, it being understood that all amounts services agreementually due at the time of suspension or termination of the Services agreement will remain payable, as far as permitted by applicable law.

Paragraph 4

Any entity, whether an arbitral tribunal or other dispute resolution body, rendering a decision in accordance with the dispute resolution provisions of the Services agreement, shall have the authority to determine the contractual consequences of any alleged non-compliance with this ICC Anti-corruption Clause.

C. Option III: Reference to a corporate anti-corruption compliance programme, as described in Article 10 in the 2011 Rules

Paragraph 1

Each Party has put into place, at the date of the entering into force of the Services agreement, or undertakes to put into place soon thereafter, a corporate anti-corruption compliance programme, as described in Article 10 of the 2011 ICC Rules on Combating Corruption, adapted to its particular circumstances and capable of detecting Corruption and of promoting a culture of integrity in its organization.

Each Party will maintain and implement such programme at least throughout the lifetime of the Services agreement and will on a regular basis inform the other Party about the implementation of its programme through statements prepared by a qualified corporate representative, appointed by it and whose name will have been communicated to the other Party.



Paragraph 2

If a Party brings evidence that the other Party's qualified corporate representative statement contains material deficiencies, undermining the other Party's program efficiency, it will notify the other Party accordingly and require such Party to take the necessary remedial action in a reasonable time and to inform it about such action. If the latter Party fails to take the necessary remedial action, or if such remedial action is not possible, the first Party may, at its discretion, either suspend the Services agreement or terminate it, it being understood that all amounts contractually due at the time of suspension or termination of the Services agreement will remain payable, as far as permitted by applicable law.

Paragraph 3

Any entity, whether an arbitral tribunal or other dispute resolution body, rendering a decision in accordance with the dispute resolution provisions of the Services agreement, shall have the authority to determine the contractual consequences of any alleged non-compliance with this ICC Anti-corruption Clause 2012.

## ATTACHMENT J
## FIRST RIGHT OF REFUSAL

1. The signers of this document maintain the first right of refusal in terms of buying copyright material encapsulating this project.

*Page 37 of 41*

## ATTACHMENT K
## EQUAL RIGHTS

1. Silvercorp USA Inc. shall strive to create a diverse project team, inclusive across gender, ethnicity, age, disabilities and national origins with emphasis on VZ citizens.

## ATTACHMENT L
## THIRD PARTY LIABILITY

1. Silvercorp USA Inc. is not responsible for any acts of violence or destruction committed by third party groups or individual during the course of Service Provider services.

2. If any civil, federal or state lawsuits are filed in either Venezuela or the USA against Silvercorp USA Inc, The Venezuelan Administration will fund the entire cost of the legal defense for Silvercorp USA Inc and bear the financial liability in the event Silvercorp USA is found not guilty. Silvercorp USA will bear financial liability if found guilty.

## ATTACHMENT M
## WEAPON REDISTRIBUTION

1. After Project Completion Operation(The exit/removal of current Venezuelan Regime and entrance/installation of recognized Venezuelan Government) Service Provider will assist facilitate weapons confiscated from all units used during project and redistributed or store all arms in accordance with directions by the Administration.

## ATTACHMENT N
## CHAIN OF COMMAND

The chain of command for this operation is as follows:

1.Commander in Chief - President Juan Guaido

2.Overall Project Supervisor - Sergio Vergara

3.Chief Strategist - Juan Jose Rendon

4. On Site Commander- To be determined



## ATTACHMENT P
## PROJECT RESOLUTION OPERATION APPROVAL

1.The final approval of the operation call be given by The Strategic Committee.

2.The Strategic Committee shall approve all stages of the operation to include, Pre deployment, Deployment, Infiltration, Vehicle Drop Off, Exfiltration, Medical Planning, Actions on the Objective, Contingencies and Command and Signal and Service and Support.

3.Emergency approval shall be given by the On Site Commander.



THEREFORE, in consideration of the matters described above and of the mutual benefits and obligations set forth in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, the Administration and the Services Provider agree to this Agreement and attachments. This Attachment has been signed on the 16th day of October, 2019, in two original copies in both the Spanish and English languages. The English version will be superior in legal procedures.

**IN WITNESS WHEREOF** the Parties duly affix their signatures under hand and seal on this 16th day of October 2019.

**SIGNED, SEALED, AND DELIVERED in the presence of or by video conference:**

LA REPUBLICA
BOLIVARIANA DE
VENEZUELA  (Administration)

By: _____
Sergio Vergara, Comisionado
High Presidential Commissioner
for Crisis Management

By: _____
Juan Jose Rendon, Comisionado
High Presidential Commissioner
General Strategy and Crisis Management

SILVERCORP USA, Inc.
(Service Provider)

By: _____
Jordan Goudreau,
CEO Silvercorp USA

_____
Manuel J. Retureta
Witness

*Page 41 of 41*