**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA**

**v.** **Case No. 8:24-cr-330-VMC-CPT**

**YACSY ALEXANDRA ALVAREZ MIRABAL.**
**_______________________________________/**

**MOTION FOR DEFENSE SUBPOENA**
**FOR TESTIMONY OF PRESIDENT DONALD J. TRUMP**
**REGARDING HIS AUTHORIZATION OF "OPERATION GIDEON"**

Respectfully, Ms. Yacsy Alexandra Alvarez Mirabal ("Ms. Alvarez") requests this Honorable Court issue a subpoena for testimony in this cause by Donald J. Trump, presently serving as President of the United States. This requested testimony is material to her defense, as outlined in detail in her RESPONSE TO UNITED STATES' MOTION IN LIMINE, Doc. 303. Ms. Alvarez asks that this testimony be taken in a manner which does not interfere with the President's important duties but makes it available for presentation at trial of this case, currently set for the Court's November 2026 Trial Calendar.

Ms. Alvarez first sets forth the law on subpoenas to Presidents in criminal proceedings, then summarizes the facts justifying this request for testimony and finally suggests possible accommodations for President Trump under existing law and Federal Rules of Criminal Procedure.

## MEMORANDUM OF LAW

> In our judicial system, "the public has a right to every man's evidence." Since the earliest days of the Republic, "every man" has included the President of the United States. Beginning with Jefferson and carrying on through Clinton, Presidents have uniformly testified or produced documents in criminal proceeding when called upon by federal courts.

*Trump v. Vance*, 140 S.Ct. 2412, 2420 (2020) (holding presidents are not immune from state criminal subpoenas) (citations omitted). In this decision, the Court recounted, *inter alia*, the famous trial of former Vice President Aaron Burr, presided over by Chief Justice John Marshall, presiding as Circuit Justice, *see id.* at 2422, during which President Jefferson tried to block a defense subpoena for documents. His prosecutors argued the President was exempt from complying with such a demand, and that the documents sought "might contain state secrets." After four days of argument, Justice Marshall ruled:

> The President . . . does not "stand exempt from the general provisions of the constitution" or, in particular, the Sixth Amendment's guarantee that those accused have compulsory process for obtaining witnesses for their defense. *United States v. Burr*, 25 F. Cas. 30, 33–34 (No. 14, 693d) (CC Va. 1807). At common law the "single reservation" to the duty to testify in response to a subpoena was "the case of the king," whose "dignity" was seen as "incompatible" with appearing "under the process of the court." But, as Marshall explained, a king is born to power and can "do no wrong." *Ibid.* The President, by contrast, is "of the people" and subject to the law. *Ibid.* According to Marshall, the sole argument for exempting the President from testimonial obligations was that "his duties as chief magistrate demand his whole time for national objects." *Ibid.* But, in Marshall's assessment, those demands were "not unremitting." *Ibid.* And should the President's duties preclude his attendance at a particular time and place, a court could work that out upon return of the subpoena. *Ibid.*

The Court then recounts, in some detail the history of Presidents subpoenaed in criminal matters, (including testimony) *id.* at 2421–24. "In 1818,

President Monroe received a subpoena to testify in a court-martial against one of his appointees." He "offered to sit for a deposition and ultimately submitted answers to written interrogatories." Subsequently, Presidents "have uniformly agreed to testify when called in criminal proceedings, provided they could do so at a time and place of their choosing." President Ulysses Grant submitted to a three-hour deposition in a criminal case. President Gerald Ford was even subpoenaed by his would-be assassin and testified in her defense "in the first videotaped deposition of a President. *See United States v. Fromme*, 405 F.Supp. 578 (ED Cal. 1975)." President Carter testified "via the same means in the trial of two local officials who, while Carter was Governor of Georgia, had offered to contribute to his campaign in exchange for advance warning of any state gambling raids." Later, Carter gave "videotaped testimony to a federal grand jury investigating whether a fugitive financier had entreated the White House to quash his extradition proceedings . . . President Clinton testified three times, twice via deposition pursuant to subpoenas in federal criminal trials of associates implicated during the Whitewater investigation, and one by video for a grand jury investigation investigating possible perjury."

After recounting the history of Presidents' compliance with criminal subpoenas for testimony, the Court, in *Trump v.* Vance, 140 S.Ct. at 2426, discusses the reasonable accommodations to presidents' burdens of office available for courts. Then, comparing the burdens of private civil suits such as *Clinton v Jones*,

(520 U.S. 681), which the Court had allowed to proceed, the Court found that criminal subpoenas were likely to be even less burdensome, *id.* at 2426:

> The same is true of criminal subpoenas. Just as a "properly managed" civil suit is generally "unlikely to occupy any substantial amount of" a President's time or attention, two centuries of experience confirm that a properly tailored criminal subpoena will not normally hamper the performance of a President's constitutional duties. If anything, we expect that in the mine run of cases, where the President is subpoenaed during a proceeding targeting someone else, as Jefferson was, the burden on a President will be ordinarily lighter than the burden of defending against a civil suit.

The Court allows that the "Executive can . . . argue that compliance with a particular subpoena would impede his constitutional duties. . .. At that point, a court should use its inherent authority to quash or modify a subpoena, if necessary to ensure that such 'interference with the President's duties would not occur.' [*Clinton*, 520 U.S.] at 708." *Vance*, 140 S.Ct. at 2431, then holding:

> Two hundred years ago, a great jurist of our Court established that no citizen, not even the President, is categorically above the common duty to produce evidence when called upon in a criminal proceeding. We reaffirm that principle today and hold that the President is neither absolutely immune from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of need. The "guard [ ] furnished to this high officer" lies where it always has—in "the conduct of a court" applying established legal and constitutional principles to individual subpoenas in a manner that preserves both the independence of the Executive and the integrity of the criminal justice system. *Burr*, 25 F.Cas. at 34.

## FACTUAL BASIS

Ms. Alvarez' public authority defense is that her conduct alleged in the indictment was authorized by President Donald J. Trump on or about October

16, 2019, as part of what was known as "Operation Gideon," an irregular paramilitary action coordinated with the U.S.-backed, then-Acting president of Venezuela, Juan Guaidó. Gideon's intended goal was the removal of the illegitimate leader of Venezuela, Nicolas Maduro, then wanted on federal narco-terrorism charges. This will be corroborated by testimony of witnesses, White House records, President Trump's public statements— including those made to a joint session of Congress on February 4, 2020— recorded recollections and statements of other senior administration officials, including a memoir by the former Secretary of Defense, Mark Esper, and a Senate Foreign Relations Committee investigation prompted by the failed Operation Gideon in May 2020.[1] *See* Doc. 303, Ms. Alvarez' RESPONSE TO THE UNITED STATES' MOTION IN LIMINE ("Response"). President Trump's actions and statements are indeed central to her defense. Relevant portions include:

**Chronology**

In **January 2019**, NBC News reported that, after months of planning by senior administration officials, President Donald Trump formally recognized then-Venezuelan opposition leader Juan Guaidó as the legitimate president of the country.[2]

[1] Former Dep. Asst. Secy. of State C.F., FBI interview, DISC–101026—29 (May 6, 2021).
[2] CAROL E. LEE AND JOSH LEDERMAN, HOW THE TRUMP ADMINISTRATION'S MOVE ON VENEZUELA CAME TOGETHER, https://www.nbcnews.com/news/world/how-trump-administration-s-move-venzuela-came-together-n962576.

> About a month ago, the Venezuelan opposition began talking to National Security Council officials and those at the embassy in Caracas. .. The idea of invoking [Article III] in the Venezuelan Constitution that would trigger the ousting of Maduro grew from those discussions.... [T]he Trump administration then began to explore U.S. recognition of the new president once that article was invoked. [Secretary] of State Mike Pompeo and National Security Adviser John Bolton were for it.... After Trump made the decision, Vice President Mike Pence called Guaidó Tuesday evening and told him: if on the following day the National Assembly invoked [Article III] that would make him president, Trump would back him.... [T]he White House started notifying congressional offices around 9 a.m. Wednesday that Guaidó planned to declare himself acting leader and the U.S. would be the first country to recognize him.... On Thursday, the State Department served notice to the Federal Reserve that Guaidó is the agent for access to Venezuelan assets in U.S. banks.

**President Trump's Close Associate Recruited Jordan Goudreau in Early 2019.**

Jordan Goudreau was recruited in early 2019 by Keith Schiller, a close associate of President Donald Trump. Schiller acted on behalf of a private entity known as "Global Governments," aimed at removing Nicolas Maduro from power, restoring democratic government to Venezuela, and opening economic opportunities there for U.S. companies. Schiller and other Global Governments principals negotiated with Juan Guaidó's representatives on this "assistance." *See* details at Doc. 243 at 4–9. Schiller, Travis Lucas, and N.S., *infra*, were among the Global Governments principals. Importantly, it was clear to all participating that

"military action" and "warfighters" of some kind would be involved.[3] Critically, Juan Guaidó's team viewed Schiller to be speaking directly for President Trump.[4]

**Keith Schiller's Close Relationship With President Trump Played an Important Role In Persuading Others Of The President's Backing.**



**Keith Schiller and George Sorial with President Trump**

Schiller's own published biography for his consulting company identifies Schiller and two other partners as "Strategists Who've Operated at the Pinnacle of Power." Schiller and current partner, George Sorial, are depicted above in the Oval Office.[5]

> In 2004, Mr. Schiller retired from the NYPD as a Detective and was hired to be the personal bodyguard to Donald J. Trump. Mr. Schiller became Director of Security for the Trump Organization, where he served for more than 18 years. After the 2016 election of President Donald J. Trump, Mr. Schiller was appointed as the Deputy Assistant to the President and Director of Oval Office Operations. . .. Upon retiring from public service,

[3] DISC–100945–46.
[4] N.S. FBI interview, Sep. 21, 2020. DISC–103478–501.

[5] Available at https://www.javelinadvisorsllc.com/?page_id=143 (Mr. Schiller is identified as Managing Director of Javelin Advisors LLC. (accessed Aug. 26, 2025). Schiller and his partners are identified as George A. Sorial and Robert W. Seiden. Photograph of Schiller and Sorial (one of his partners) in the Oval Office, accessed from his company website on Mar. 17, 2025, but since deleted. Mr. Schiller was served with a defense trial subpoena through counsel on Mar. 10, 2025.

> Mr. Schiller launched his own company, KS Global Group LLC, which focuses on defense and security consulting. He was hired by the Republican National Committee as Security Consultant advisor and currently works with both private and public entities both domestically and abroad....

Mr. Schiller's critical role was described by N.S., Global Governments "Corporate Affairs Director," in a lengthy FBI interview. N.S. told agents that all involved considered Keith Schiller as speaking for President Trump in approving what N.S. and others knew was to be an armed incursion to remove Nicolas Maduro. The statements by N.S. to the FBI included:[6]

> **The fact that SCHILLER and President Donald TRUMP were close associates made SCHILLER important** to Global Governments' legitimacy. **This was a big deal to the Venezuelans because they need presidential backing** for anything they do. . ...
>
> **SCHILLER's presence at the meeting "spoke volumes" to people present** about potential government support because SCHILLER had worked in the White House and had worked directly with President Trump for many years....[7]
>
> SCHILLER brought Silvercorp (Goudreau's company) to the table.
>
> . . . .

**Schiller "Insisted" Goudreau's Paramilitary Plans Be Discussed "Outside of the U.S."**

In April 2019, Keith Schiller sent a Signal message to a GA-2 (Guaidó Advisor–2) to tell GA-2., "[Schiller] saw a picture of GA-2 with [Secretary]

---

[6] N.S. FBI Interview, Sep. 21, 2020, DISC-103478–501 (emphasis added).

[7] N.S., Schiller, TRAVIS LUCAS, R. K., A.D., GA-2 (Guaidó's advisor, *see* N.14, *infra*) and Venezuelan Ambassador Vecchio's assistant, attended this meeting. *Id.*

Pompeo in Colombia."[8] Schiller wanted GA-2 to meet Goudreau in Colombia to discuss a plan Goudreau had ready . . .. "Schiller insisted that when Goudreau presented plans to GA-2 that it took place outside of the U.S."

**Key Agreements Were Signed in October 2019.**

In October 2019, several agreements were signed in Washington, D.C. and Miami, Florida, with Acting President Juan Guaidó, other Venezuelan opposition officials, and Jordan Goudreau, as Chief Executive Officer ("CEO") for Silvercorp, Inc. *See* Exhibit One. These agreements described an armed incursion to be conducted by Goudreau and others, and provided Guaidó with "deniability," in the event the effort failed. *See* Doc. 303-1 at 16. ("DENIABILITY/CREDIT"). The documents were reviewed for Goudreau by the former judge, attorney and lobbyist, Travis Lucas (described to the FBI by Schiller as a "mentor.") According to the government, Travis Lucas has refused to be interviewed by the FBI.

**Keith Schiller And Three Others Were Logged Into The White House to Meet President Trump As The Guaidó Contract Was Signed.**

According to White House visitor logs, on October 16, 2019, at 9:00 A.M, Keith Schiller, George Sorial (a former long-time Trump Organization official and current lobbying business partner of Schiller's pictured above in the Oval Office

[8] July 31, 2020, FBI Interview, DISC–103469—103477, 103470—71 (GA-2 unidentified here because this report is subject to a Protective Order).

with Trump)[9] and two other persons were logged into the White House "WW-OVAL" to meet "POTUS." Then, at 10:00 A.M., Schiller, Sorial and two others, were logged in to visit "POTUS" in the "RES-YELL."[10]

**Schiller and Travis Lucas Met With Goudreau Approximately Two Hours Later.**

At approximately 12:00 P.M., Goudreau met with Travis Lucas at the Trump Hotel in the Old Post Office building in Washington, D.C., where they discussed the signing of the agreement which had just occurred. Lucas was "ecstatic" about the agreement and told Mr. Goudreau that Keith Schiller was in the hotel and wanted to see Goudreau. According to Goudreau, Schiller was very pleased the agreement had been signed and told Goudreau he had "authorization from the President" for this mission, the subject of the contract just signed. Schiller admitted to the FBI that he had a meeting Goudreau in the bar of the Trump Hotel (in his 2021 interview, Schiller thought it was November or December 2019) and discussed an agreement signed with the Venezuelans but denied passing authorization from President Trump to Goudreau. Schiller also told the FBI that Goudreau said he had money in the contract for Schiller but that he was "uncomfortable with the talk" and connected Goudreau with Travis Lucas for counsel on the contract. [11]

---

[9] Sorial, Schiller's current business partner in several apparently lucrative lobbying businesses, is someone Schiller claimed (through counsel) he could not recall as present for this meeting.
[10] DISC–101157–158.
[11] Schiller FBI Interview, DISC-101047–059. *See also* Goudreau's sworn statement of Oct. 20, 2020, at DISC–100983.

Travis Lucas introduced Goudreau to "military contacts in Washington," identified as Drew Horn and J.B.[12] Goudreau told N.S. that these contacts understood exactly what he needed. They talked about ITAR, money and equipment. Not long after that, N.S. met with Travis Lucas who reported something similar. . .. Goudreau wanted to stress that he had government backing. **N.S. thought GOUDREAU did have government backing.**"[13]

Substantial information on the record exists concerning these two "military contacts," (Horn and J.B.) and what they did to facilitate Gideon, *see* Signal messages, Doc. 243 at 12–21. For the purposes of this response, it is important to note that one of them, Andrew Horn (previously identified both as "A.H." and "Drew Horn") was, at the time, serving as Associate Director of Policy in the Office of the Vice President. Horn told the FBI he obtained this job in Vice President Pence's office because "he was a military veteran with work experience in Afghanistan." He later transferred to the Office of the Director of National Intelligence (ODNI).

While both Horn and J.B., in 2021–22 FBI interviews, clearly tried to distance themselves from Goudreau and Gideon, they substantially corroborate the defendants' reasonable belief that they had the presidential authority conveyed by

[12] This J.B. was a United States government official identified previously by these initials.
[13] N.S. FBI Interview, DISC-103493–494.

Keith Schiller.[14] For example, *see* Doc. 243 at 13–14, UNOPPOSED MOTION FOR SUBPOENA DUCES TECUM:

Horn contacted Goudreau on December 9, 2019, via Signal, asking if J.B. had been in touch:

> ***We've war-gamed things out to the best of our ability, he's (J.B.) got the next step.***[15]

On December 10, 2019, White House visitor logs show J.B. attended a meeting with J.W., then-director of foreign military sales at the National Security Council (NSC). When J.B. explained this to the FBI two years later, he said he *was* talking to someone at the NSC, but not about Goudreau. J.B. refused to "disclose the names of anybody he talked to in the NSC" and, apparently, the FBI did not pursue this further.[16]

J.B. currently serves in the Office of the Secretary for the Department of Veterans Affairs. His published biography indicates he has the relevant background and experience to consult with Goudreau on a project of this nature:[17]

> [J.B.] joined the United States Navy in 1990, the Army Special Operations Forces in 1994 and the Joint Special Operations in 2005. He has been deployed to Iraq, Africa, the West Bank and Gaza Strip. He is an expert in Military intelligence, diplomatic security, foreign internal defense, unconventional warfare, and counterterrorism.

---

[14] *See* FBI Interview of Horn, DISC-101009–101025 (Sep. 7, 2021), Horn's Signal chats with Goudreau, DISC-100809–812; FBI Interview of J.B., DISC-101036–041 (Feb. 16, 2022).

[15] A.H. Signal Communication, DISC-100801.

[16] FBI Interview of J.B., DISC-101039.

[17] Available at https://www.hillvets.org/team-7/[J.B.] (last accessed Sep. 12, 2025).

**On January 28, 2020, A.H. and Goudreau met at P.J. Clark's Restaurant in Washington, D.C.**

In late January, there were follow-up meetings.

**Goudreau** messaged **A.H.** on January 25, 2020, at 11:43 A.M.:

> ***Hi [A.H.]. I have been working very hard on the project. We have made a breakthrough. I will be in DC this week. It is important that we meet. Let me know what day is good for you. Thanks***

Twenty-five minutes later, Horn responded

> ***Let's do it. . . Can you do 3pm at P.J. Clark's!***[18]

Horn was eager to meet with Goudreau. At the restaurant, A.H. and Goudreau discussed Goudreau's plans in person, including licensing and ITAR and, importantly, A.H. told Goudreau that he did not *need* more than the authority he already had to "do what he needed to do" to accomplish his mission. A.H. also made the comment that "we don't care how bloody it is, after [Guaidó is installed] the money will flow."

Horn persisted in Signal communications with Goudreau, with Horn attempting to intervene with the Departments of Justice and State on behalf of Gideon, up until the invasion failed in early May 2020. Horn then "went dark."

As of June 30, 2026, Horn was a business partner of both Keith Schiller and George Sorial in GREENMET, a company engaged in securing contracts for mining of strategic minerals, recently focusing on Greenland. *See*

[18] A.H.'s Signal chats with Goudreau, DISC-100801–803. (A.H. even apologized, en route to the P.J. Clark meeting, for running 10 minutes late.)

AS TRUMP TALKED ABOUT TAKING GREENLAND, FORMER EMPLOYEES, GAINED A FOOTHOLD IN THE ARCTIC ISLAND (Jun. 30, 2026), https://www.occrp.org /en/scoop/as-trump-talked-about-seizing-greenland-former-employees-gained-a-foothold-in-the-arctic-island.

**The Defendants' Belief That The President Sanctioned Gideon Was Further Supported By Juan Guaidó's Reception in Congress and at the White House In February 2020, While The Senate Voted On Trump's Impeachment.**

On February 4, 2020, the assembled Members of Congress wildly cheered President Trump's salute to his guest, Juan Guaidó's heroic fight to replace the illegitimate Nicolas Maduro.



***President Juan Guaidó receiving standing ovation at State of the Union***

A brief video excerpt from this event published by the Public Broadcasting System, https://www.youtube.com/watch?v=tOibfOxrbd4 , illustrates this vividly. The following morning, National Public Radio characterized the event as follows: Franco Ordonez, *Venezuelan Opposition Leader Juan Guaidó Inspires Rare Bipartisan Moment* (Feb. 5, 2020):

> Support for Guaidó and his efforts to restore democracy in Venezuela is one of the few administration policy priorities that have received sustained bipartisan support....
>
> Last year, the U.S. was the first country to recognize Guaidó as the legitimate interim president of Venezuela. Since then, nearly 60 nations have also recognized Guaidó as president.
>
> [Guaidó's] only relevance is his international recognition and his ties to the White House.
>
> "All Americans are united with the Venezuelan people in their righteous struggle for freedom," Trump said.

Notwithstanding the bipartisan ovation February 4, the maelstrom of large political forces at play were brought into sharp relief the next day, February 5, 2020, even as the President was acquitted on two articles of impeachment. Minority Leader Chuck Schumer spoke from the Senate floor:[19]

> Maybe the best metaphor for [Trump's false promises was his] claim to bring democracy to Venezuela. There's a big policy there. It flopped. If it was working, Juan Guaidó wouldn't be in the balcony here, he'd be in Venezuela! He'd be sitting in the president's palace or at least be waging a fight to win.

**White House Meetings February 5, 2020**[20]

As the Majority Leader spoke, Trump and the Venezuelans met in the Oval Office, as chronicled by former Defense Secretary Mark Esper in his memoir.[21]

---

[19] https://www.youtube.com/watch?v=qbxSIUMEMSc (last accessed Jan. 5, 2026).

[20] This is the meeting depicted in former Defense Secretary Mark Esper's memoir, *infra, n.32,* with the caption: ". . . *The National Security Council seemed eager to employ military force against Venezuela, and I was concerned that such a predisposition could turn into a pre-election 'October Surprise.'*"

[21] MARK T. ESPER, A SACRED OATH: MEMOIRS OF A SECRETARY OF DEFENSE DURING EXTRAORDINARY TIMES at 299–303 (2022). Trump fired Esper Nov. 9, 2020. https://www.npr.org/2020/11/09/933105262/trump-terminates-secretary-of-defense-mark-esper.

Esper wrote he met with Trump beforehand "trying to learn if the [National Security Council] had put any outlandish ideas in Trump's head."



In the larger meeting with Guaidó (above) [22] immediately following Esper's private conversation with President Trump, Trump asked Guaidó and the assembled group, "What if the U.S. military went down there and got rid of Maduro?" This made Secretary Esper "wince," but [Esper] pressed Guaidó on his ability to organize an expatriate force.

> Then, out of the blue, one of Guaidó's colleagues looked at me from across the table and said something like "We have some plans you [the U.S. government] know we are working on, they're just not ready yet." **There was some quick reference to Florida too** (emphasis added). As he finished the sentence, he smiled, looked away from [Esper], and **made eye contact with [Mauricio] Claver-Carone, the NSC senior director [for the Western Hemisphere] who was pressing the hardest for military action**. . .. Something was up. . . In early May 2020, two former U.S. Special Forces soldiers led a group of nearly sixty Venezuelan dissidents in a failed attempt ... Guaidó reportedly approved the operation. . .. [T]he U.S. government was not involved in this operation, to the best of my knowledge. However, I often wondered if this was the plan referred to by

[22] The photograph shows Guaidó with President Trump, Secretary Esper, and National Security Adviser Robert O'Brien. Also present were Venezuelan ambassador Carlos Vecchio, and the former president of the Venezuelan National Assembly, Julio Borges.

Guaidó's team at the White House back in February and, if so, to what degree was the NSC aware and involved.

Secretary Esper may have had more than intuition guiding his focus on NSC senior director Claver-Carone, according to a June 2019 "Washington Post" interview of the then- jailed General Manuel Figuera, head of the Intelligence Police, the "feared SEBIN," under Maduro.[23] Figuera was part of Guaidó's failed coup attempt (not part of Gideon) in April 2019, in which Claver-Carone participated using the moniker, "Comeninos," which translates to "Child Eater" in English, according to General Figuera, who escaped to the United States with the help of "U.S. operatives in neighboring Colombia."

**In March 2020, The United States Indicted Nicolas Maduro.**

On March 26, 2020, former Attorney General William Barr announced the indictment of "former" Venezuelan President Nicolas Maduro and others on Narco- Terrorism charges.[24] A $15 million reward was offered for Maduro's arrest. In August 2025 the reward for Maduro increased to $50 Million. Notably, Maduro is now awaiting trial in New York courtesy of United States military and federal law enforcement forces acting on President Trump's orders.

---

[23] https://www.washingtonpost.com/world/the_americas/maduros-ex-spy-chief-lands-in-us-armed-with-allegations-against-venezuelan-government/2019/06/24/b20ad508-9477-11e9-956a88c291ab5c38_story.html?noredirect= on&noredirect=on

[24] Press Release, United States Attorney, S.D.N.Y., MANHATTAN U.S. ATTORNEY ANNOUNCES NARCO-TERRORISM CHARGES AGAINST NICOLAS MADURO, CURRENT AND FORMER VENEZUELAN OFFICIALS, AND FARC LEADERSHIP (Mar. 26, 2020), available at https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-narco-terrorism-charges-against-nicolas-maduro-current (last accessed Aug. 25, 2025).

**Included In the 2020 SDNY Maduro Indictment Was General Cliver Alcala, Which Jeopardized Operation Gideon.**

After receiving an urgent message from Goudreau on the date of the indictment's announcement, Drew Horn offered to try to intercede with the Department of Justice for General Alcala.[25]

**Horn to Goudreau by Signal chat at 11:41 A.M. on March 26, 2020:**

> *Reaching out now. This is a tough one, but I will do everything I can... My guy at state is working it now. . . Do you want me to try to get DOJ to appeal the narco designation?*
>
> **Goudreau:** ***Yes, please appeal the narco designation.***

Horn did, in fact, reach out to the responsible Deputy Assistant Secretary of State, who recalled the conversation when interviewed by the FBI.[26] C.F. told agents she [also] thought [Horn wanted] Alcala to not be indicted. The following day, March 27, Horn passed on bad news:

> ***Hey brother, I pushed along my concerns on this to state/justice. They said he's on a plane to ny and they are tracking everything, not sure what that means but it's all I can do for now . . . There is huge sensitivity with wh interference with doj right now so my hands are tied until I transition to dni on Monday.***[27]

**As Late as the Time of the Failed Invasion April 26–May 4, 2020, Drew Horn and Goudreau Remained In Contact.**

Between April 26 and May 4, 2020, Horn and Goudreau continued to

---

[25] Horn's Signal chats with Goudreau, DISC-100804–809.
[26] C.F. FBI interview, DISC–101026–1029, at 1028 (May 6, 2021).
[27] Horn was not just making excuses. *See, e.g.,* Peter Baker and Michael D. Shear, *How Trump's Relationship with Barr Got So Complicated*, N.Y. Times, Feb. 14, 2020.

discuss Gideon and immediate requests by Goudreau. [28] For example, late on May 3, 2020, **Goudreau messaged HORN**:

> ***2 US ex green berets in Venezuela fighting alongside the men from earlier today . . . I have 500 people in Colombia standing by but in need state department approval to send guns and ammo . . . My 2 were just captured...***

**HORN responded:** ***Let me see what I can do . . .*** Then, silence...

**The Two "Just Captured" Were Former Green Berets Luke Denman and Arian Berry.**

In Venezuelan television interviews distributed May 6, 2020, both Denman and Berry described their employment as mercenaries for Silvercorp and Jordan Goudreau and displayed a copy of the Guaidó Contract;[29]

> **Denman**: My responsibilities to Silvercorp are written in a contract or described in a contract (document displayed) signed by Jordan Goudreau, Juan Rendon, and Juan Guaidó. In total there were 50 or 60 or so, 20 people per group . . . to meet Venezuelans in Colombia, train them, and come with them to Venezuela to secure Caracas and secure the airport here for follow-on.

In a second short video released by Venezuela, an interrogator questioned Denman concerning the planned capture of Nicolas Maduro and his removal from Venezuela. It contains the following exchange:[30]

> **Denman**: . . . establishing our security, communicating with the tower,

---

[28] Horn's Signal chats with Goudreau, DISC-100809–812.

[29] https://www.youtube.com/watch?v=Mu7QEAEJc2g (last accessed Oct. 4, 2025) (Displaying a copy of Defense Exhibit One.)

[30] https://www.dailymail.co.uk/video/news/video-2166754/Video-Captured-coup-plotter-says-Trump-gave-orders-mercenaries.html (last accessed Oct. 4, 2025). Denman gives visual cues signaling coercion, but the defense intends to prove he *was* advised Gideon was authorized at the highest level by the U.S. Government.

bringing in planes, one of which includes one to put Maduro on and take him back to the United States.

**Interrogator**: Who commands Jordan?

**Denman**: President Donald Trump.

**Interrogator**: Who gives you the weapons and the tactical uniforms?

**Denman**: Jordan [Goudreau] through Silvercorp.

**Interrogator**: (unintelligible) Silvercorp?

**Denman**: Private security contracting, consulting, known in some places as mercenary work.

**"Victory has a thousand fathers, but defeat is an orphan." John F. Kennedy, in the aftermath of the failed Bay of Pigs invasion.**[31]

As the Venezuelans fed the press the above information, Secretary of State Mike Pompeo told assembled media reps, "There's no U.S. government *direct* involvement in this operation . . . As for who bankrolled that we're not prepared to share any more information about what we know took place. . .. If in fact if these are Americans that are there . . .. we want to get every American back."[32]

Gideon's failure became controversial. Amid a hotly contested general election, the United States Senate Foreign Relations Committee certainly saw reason to believe that the Trump Administration was behind the abortive attempt on Maduro. The same State Department official, above, whose

[31] **John F. Kennedy**, "*A Thousand Days," by Arthur M. Schlesinger Jr [1965]., p289.* (Comment made by JFK in the aftermath of the failed Bay of Pigs invasion, 1961.)
[32] Video available https://www.youtube.com/watch?v=hDju8zDkwvI, courtesy of Associated Press (italics inserted) (last accessed Jul. 3, 2026).

assistance was sought by Drew Horn concerning General Alcala, later told the FBI she was called upon to "[give] multiple briefings to [C]ongress" because "[t]he [S]enate was concerned that GOUDREAU'S operation was a US sanctioned activity."[33] The government has provided copies of 73 total questions of the Senate Foreign Relations Committee about Operation Gideon with (arguably less than candid) State Department answers. *See* Doc. 303-2 and 303-3.

## ARGUMENT

Ms. Alvarez submits that she has provided a more-than-adequate factual basis to establish that President Trump can provide testimony directly relevant to her defense. There is little doubt that President Trump and his administration sponsored the administration of Acting Venezuelan President Juan Guaidó and his efforts to remove the illegitimate leader, Nicolas Maduro, which President Trump ultimately did on January 3, 2026. That military/civilian operation acted on the indictment returned in March 2020 in the Southern District of New York.

It is extremely unlikely that Juan Guaidó would have signed the agreement, Doc. 303-1, with Silvercorp and Jordan Goudreau in the Washington, D.C. office of the Venezuelan's attorney, on October 16, 2019, without the knowledge and approval of the Trump administration, and likely, President Trump personally. That same date, Trump's longtime trusted, close associates,

---

33 C.F. FBI interview, DISC–101026–11029.

Keith Schiller (intimately involved with Goudreau and Silvercorp) and George Sorial, met in the White House with the President personally, as documented by White House logs. This was followed by meetings that same date with Jordan Goudreau at the Trump hotel to convey President Trump's personal approval.

On January 28, 2020, a top aide to Vice President Pence, Andrew Horn, met with Jordan Goudreau in Washington. Horn re-affirmed Schiller's message conveying the administration's authority. When asked about State Department approval for weapons transfers, Horn told Goudreau he had all the authority necessary and needed nothing further. This was corroborated by the Signal communications between Horn and Goudreau which continued up until the failed incursion of Venezuela. All of this was further corroborated by the recorded statements of captured former Green Berets, who claimed the incursion was authorized by President Trump.

If, as Ms. Alvarez sincerely believes, the President testifies that he authorized Operation Gideon, she believes that her prosecution will likely be ended. If not, this affirmation is likely to persuade a jury that Ms. Alvarez either had authority as she believes, or the jury is at least more likely to believe that her belief the President authorized this effort to free Ms. Alvarez's native land was an honest belief. If President Trump denies authorizing Operation Gideon, and a jury believes his denial, it may harm her defense. Either way, Ms. Alvarez

submits she has presented a sufficient factual basis to require President Trump's testimony.

## SUGGESTED ACCOMMODATIONS

Presuming President Trump would be unavailable to appear personally at a trial, the defense suggests a video-recorded deposition be taken under the provisions of Rule 15 of the Federal Rules of Criminal Procedure, at a time and place convenient to the President. This situation undoubtedly qualifies as an "exceptional circumstance" under R. 15(a) and would be warranted by the circumstances.

**WHEREFORE**, the Defendant, YACSY ALEXANDRA ALVAREZ MIRABAL, requests this Honorable Court authorize issuance of a defense subpoena for the testimony of President Donald J. Trump in this cause.

Respectfully submitted,
S/ Christophir A. Kerr
Christophir A. Kerr, Esq.
Lead Counsel for the Defendant
Christophir A. Kerr, P.A.
Florida Bar No. 72041
13801 Walsingham Rd., #A-154
Largo, FL 33774
Tel: (727) 492-2551

S/ Bjorn E. Brunvand
BJORN E. BRUNVAND, ESQ.
Co-Counsel for the Defendant
BRUNVAND, WISE & FARINELLA LAW GROUP
615 Turner Street

Clearwater, Florida 33756
Telephone No.: (727)446-7505
Facsimile No.: (727)446-8147
Email: bjorn@acquitter.com
Florida Bar No. 831077

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing has been furnished by electronic filing to Elizabeth M. Warren, Clerk of the Court, U.S. District Court, Middle District of Florida, U.S. Courthouse, 801 N. Florida Ave., #223, Tampa, FL 33602-3800, on this 11th day of August 2026, for distribution to parties of record.

S/Christophir A. Kerr
Christophir A. Kerr